**Louis A. PIEPER, Plaintiff-Respondent,**

v.

**FIRST NATIONAL BANK OF LINN CREEK, CAMDENTON, a corporation, and Jack R. Seal, Defendants-Appellants,**

**Link's Landing, Incorporated, Defendant.**

**No. 54312.**

Supreme Court of Missouri,
Division No. 1.

May 11, 1970.

———◆———

· John W. Goodin, St. Louis, Kay & Quigley, Eldon, for plaintiff-respondent.

Hugh Phillips, John E. Parrish, Phillips & Parish, Camdenton, for defendant-appellant First National Bank of Linn Creek, Camdenton.

Paul Scott Kelly, Jr., Howard E. Bodney, Kansas City, P. Pierre Dominique, Jefferson City, for defendant-appellant Seal; Tucker, Murphy, Wilson, Lane & Kelly, Kansas City, of counsel.

HIGGINS, Commissioner.

Appeal from judgment in replevin action awarding respondent possession of a 1967 model 40-foot Owens Inboard cruiser boat, Serial No. 40A04746, actual value $35,000.

Louis .A. Pieper of Waterloo, Illinois, first became acquainted with Robert T. Smith, d/b/a Campmarina, in Camden County on the Lake of the Ozarks, in April, 1966. Mr. Smith's operation under his trade name consisted of boat sales, rentals, storage, and repairs. On Memorial Day weekend, 1966, Mr. Pieper purchased from Campmarina for cash a new 20-foot XL Owens boat which he used every weekend from Memorial Day until Labor Day, 1966, storing it between weekends at Campmarina. On later occasions he bought a new 28-foot Owens cruiser and a new 35-foot twin Owens, each time paying the cash difference after trading in the older boat. In May, 1967, Mr. Pieper became interested in the 40-foot Owens cruiser, the subject of this action. He first saw it at the Campmarina dock in the Fall of 1966, and it still appeared to him as a new boat in May, 1967. The tachometer then showed ten hours' use. Mr. Smith "showed the boat to us, and we talked about it * * *. We agreed to purchase the boat. He agreed to have it ready the next week-end." On the next weekend, May 27, 1967, Mr. Smith delivered the boat to Mr. Pieper and Mr. Smith received the 35-foot Owens twin and a cash balance of $13,000 from Mr. Pieper in full payment. Within two weeks Mr. Smith secured a registration of the boat for Mr. Pieper. Mr. Pieper also placed a name, "Anna Maria," on the stern of the boat. Mr. Pieper kept the boat at Campmarina and operated it all summer until late October, at which time he left the boat with Mr. Smith to be prepared for winter when indicated. On the Monday following Thanksgiving, Mr. Pieper learned from a friend who was visiting at the lake that his boat was not in its usual place. He called Campmarina for Mr. Smith and learned that a Mr. Young had taken over Campmarina on behalf of Karlen Investment Company. Mr. Young suggested he· call the First National Bank at Camdenton and, when the information from the bank was unsatisfactory, Mr. Pie-. per went to the lake and found his boat stored at Link's Landing. Mr. Pieper filed this suit December 19, 1967, and, upon giving bond, received a court order directing the boat be delivered to his possession. Mr. Pieper acknowledged that he was aware of procedures respecting notice of interest claimed on account of loans made on personal property and that he made no such investigation in this purchase.

Despite the new appearance of the 40-foot boat in September, 1966, when first seen by Mr. Pieper, and in May, 1967, when he purchased it as a new boat, the boat had previously been sold by Campmarina to Jack R. Seal of Overland Park, Kansas. Mr. Seal was the owner of a 30-foot Chris-Craft cruiser which he began storing with Mr. Smith at Campmarina in the Summer of 1965. In the Fall of 1966, "we had attempted to trade our Chris-Craft in on the 40-foot Owens, but at the price Bob was willing to * * * I couldn't afford to do it. * * * he said that he would sell me outright the 40-foot Owens at his cost, because he had had it on his floor for quite sometime, and he said that the interest was killing him or eating him up. * * * we finally talked * * * if he would sell my Chris-Craft, or make a good attempt to sell my Chris-Craft, then I would consider buying it cash outright, with no tradein." Mr. Seal and Mr. Smith reached agreement and, on October 12, 1966, a "Retail Time Contract and Security Agreement" was executed by Campmarina as seller, and Jack R. Seal as buyer, of the 40-foot Owens boat. The sale was for $31,000 plus a time charge of $1,855, and the agreement recited the boat as the security. Attached to the contract and security agreement was a note for the total time price. The note, to become payable May 12, 1967, was signed by both Smith and Seal as makers with First National Bank of Linn Creek as payee. Smith and Seal also executed Kansas and Missouri Uniform Commercial Code Financing Statements showing Jack R. Seal as "debtor" and Campmarina as "secured party." From October 12, 1966, the date of the purchase, to April 1, 1967, the 40-foot boat was not used by Seal because the weather was too cold and Mr. Seal had the boat stored for the winter in its new condition. They used the boat "two or three times" in April, 1967, during which time ten hours' use was registered on the tachometer. During this same time, Mr. Smith had possession of Mr. Seal's Chris-Craft for the purpose of sale. "Along about the

first of May I finally decided that I would try to sell my boat and I was unsuccessful, and Mr. Smith said he had it sold on several occasions. I know now, I don't believe he even tried. But—so I told Bob I certainly was not in the financial position to own two boats, and it seemed to me it would be a lot easier to sell the Owens than my boat. What I wanted out of my boat I would like to have, but I said, 'Go ahead and sell the Owens and I will get the bank paid off and the note, which was due or coming due in May.'" He first heard that Mr. Smith was selling the Owens "after the note was due, because I had gotten a notice from the bank and I called him and he said that he had two or three people that was looking at it and he thought he would be able to work out a deal on it right away, and he would call Mr. Farmer to let him know that he was trying to sell it and get the note paid off. * * * The agreement was that the proceeds of the sale of the boat would be taken and pay the first money received on the boat, would be paid on the note that was payable to the First National Bank." Later, "Mr. Smith called me and said that he had a down payment on the boat and that he was going to take it down to the bank the next day and apply it against the note. * * * and I * * * called the bank and talked to Mr. Farmer and asked them to call me back and confirm when the payment was made." The bank did call and told him that $13,000 had been paid. Sometime after he had "authorized Mr. Smith to sell the boat," Mr. Seal moved from Campmarina and, still later, "Mr. Farmer called me * * * and said that he hadn't been able to get ahold of Bob Smith, * * *. I called Bob Smith and he said the people that had bought the boat had made the financial arrangements and were bringing a check that weekend. * * * So he assured me that the minute this check was deposited, he would take it directly to the Bank of Camdenton and pay off the note. * * * I think I relayed this information" to the bank. Finally, around Thanksgiving Day, 1967, Mr. Seal

received a call from Mr. Farmer "and he said that he was down at Camp Marina, and he said the boys said that something has happened here and he said that they were going about moving boats out right and left, and he said there is an outfit in St. Louis moving in and running it * * *. He said that it appears that this man has sold boats two or three times." They agreed to take possession of the 40-foot Owens and move it to Link's Landing. Upon cross-examination, Mr. Seal further acknowledged that he contacted Mr. Farmer at the bank and told him that he had asked Mr. Smith to sell the 40-foot Owens and apply the proceeds on the note.

Lee W. Farmer, President of the First National Bank of Linn Creek at Camdenton, Missouri, had been in the banking business thirty-eight years. He had financed transactions for Robert T. Smith and Campmarina on several occasions. On September 30, 1966, Mr. Smith called Mr. Farmer with respect to financing the sale of the 40-foot Owens boat to Jack R. Seal. He gave Mr. Seal's name, address, and the name of two banks for purposes of a credit check. After obtaining necessary credit information Mr. Farmer so notified Mr. Smith. On October 18, 1966, Mr. Smith went to the bank with the "Retail Time Contract and Security Agreement" as previously executed by Mr. Smith and Mr. Seal concerning the purchase and security of the 40-foot Owens. Mr. Smith, in the presence of Mr. Farmer, struck his name as a maker of the note and also wrote Campmarina over the previously-named payee, First National Bank. With the note now in this condition, Mr. Smith endorsed the note and assigned the contract and security to the bank. The bank also received the Missouri financing statement executed by Mr. Seal and Mr. Smith which it filed the following day in Camden County and forwarded the Kansas financing statement, also as executed by Seal and Smith, to Johnson County, Kansas. Upon receipt of, and as consideration for, these documents as finally executed, the bank credited the account of Campmarina with $31,000, same

being the "note on Jack R. Seal $32,855.00 Less Interest to May 12, 1967—$1,855.00."

On June 13, 1967, Robert T. Smith made the payment of $13,000 resulting from sale of the boat, and it was credited to the Jack R. Seal note. No further payments were received. On Thanksgiving Day, or the day before, Mr. Farmer went to Campmarina and, with Mr. Seal's permission, took the boat to Link's Landing. Mr. Farmer was at all times aware that Mr. Smith was a dealer in boats and that he sold new Owens cruisers. He knew that when he received the $13,000 payment on the Seal note the boat in question had been offered for sale. Mr. Smith informed him that the $13,000 paid June 13, 1967, came as a result of the sale of the boat described in the security agreement assigned by Mr. Smith to the bank. Prior to that time, he had been told by Mr. Seal that he had asked Mr. Smith to sell the boat. At no time after May 12, 1967, the due date of the note, and prior to Thanksgiving Day, 1967, did he attempt to regain possession of the boat. When he took possession of the boat, he noted Mr. Pieper's registration but made no attempt to contact him and, when advised of the sale of the boat, he made no inquiry as to the purchaser. Link's Landing had nothing to do with moving the boat but simply received it for storage from Mr. Farmer, and Mr. Farmer became concerned about moving the boat only upon learning "there was a tear-up happening at Camp Marina." Mr. Farmer was also told by Mr. Smith that he had collected the balance of the note from the purchaser of the boat, Mr. Pieper.

The case was tried without a jury and the court found "generally for the plaintiff and against defendants First National Bank of Linn Creek, * * * and Jack R. Seal, and against plaintiff and for defendant Link's Landing, Incorporated. * * * that the plaintiff, at all times mentioned in his petition, was lawfully entitled to the possession of the 40 foot Owens Inboard Cabin Cruiser, Serial No. 40A04746, described in his petition"; and

entered judgment "that plaintiff have and retain the exclusive possession of said Cruiser as against defendants Jack R. Seal and First National Bank of Linn Creek * * *; that plaintiff's petition be dismissed as to defendant Link's Landing * * *."

With such general judgment in this court-tried case, it is the duty of this court, upon appeal, to review the case anew upon its merits, "as in suits of an equitable nature"; and "the judgment shall not be set aside unless clearly erroneous." Civil Rules 73.01, 83.13, V.A.M.R.

Appellants contend that this case is governed by the Uniform Commercial Code, Sections 400.1 to 400.10, V.A.M.S.; that to reach its result the court, of necessity, had to find that the boat constituted "inventory" under Section 400.9–307(2) rather than "consumer goods" under Section 400.9–307(1); that such finding was erroneous and, therefore, the judgment should be reversed. This, of course, is an assumption that the court entered its judgment on the strength of such a finding, because, without specific findings of fact and conclusions of law, it cannot be said that such ground was the basis for the judgment to the exclusion of any other supported ground.

This detailed statement of facts fully supports a finding that although Campmarina and appellants Seal and First National Bank may have dealt between themselves in terms of the Uniform Commercial Code, appellants waived their protections under the code as far as respondent is concerned by authorizing Campmarina in their behalf to sell the collateral, i. e., the boat in issue. Respondent purchased what appeared to be a new boat from appellants' authorized seller, Campmarina, a dealer in boats, and he paid their agent the sale price in full. There can be no question from the testimony of Mr. Seal that he specifically authorized Campmarina to sell the boat and to apply the proceeds to his note held by First National Bank by virtue of the assignment from Campmarina to the bank. There also is no question that Mr. Seal advised Mr. Farmer, president of the bank, that he had authorized sale of the boat by Campmarina, and that the bank, by its acquiescence, also authorized the sale. Finally, on this issue, there can be no question that the bank accepted and applied on the Seal note a payment of $13,000 which it knew came from the sale of the boat, and that the bank and Mr. Seal, in reliance on their seller, accepted and recognized the payment as a down or part payment on the sale of the boat, when in fact, their seller had received full payment from respondent. These circumstances are further strengthened by evidence of efforts made by appellants over the six months following the sale to collect the balance from their agent to the exclusion of any effort to notify respondent of any interest or claim in the boat. Only after their seller and stakeholder, Bob Smith, lost Campmarina without paying them, did appellants think of their security.

This disposition under the facts of this case is recognized in the Uniform Commercial Code Comment following Section 400.9–307, supra, "Protection of buyers of goods," that "the limitations which this Section imposes on the persons who may take free of a security interest apply of course only to *unauthorized* sales by the debtor. If the secured party has *authorized* the sale in the security agreement or otherwise, the buyer takes free without regard to the limitations of this Section." 2 Anderson's Uniform Commercial Code, § 9–307:2, pp. 568–569, amplifies this comment, stating that Section 400.9–307 "determines the liability of the buyer of goods as respects an outstanding security interest in the goods when the sale is unauthorized by the secured party.

"If the sale of goods is authorized by the secured party the buyer always takes clear of a security interest in the goods and no question arises to which Code § 9–307 would apply."

Demonstration of this proposition appears in Clovis National Bank v. Thomas, 77 N.M. 554, 425 P.2d 726, where the facts were quite similar to those of this case. Clovis National Bank sued for conversion of cattle by defendant, a cattle commission company. The bank had loaned money to W. D. Bunch and secured the original indebtedness on 46 head of cattle. This security was further extended to 102 head of cattle. Subsequently, Mr. Bunch deposited a sum with the bank against the indebtedness which represented proceeds from the sale through defendant of 35 head of the security cattle. Subsequently, an additional sum was deposited against the indebtedness realized from sale of another 56 head of cattle. The bank was aware that Bunch was making sales of the security cattle. Subsequently, Mr. Bunch acquired additional cattle subject to the same security agreement as did his son, Bunch, Jr., whose acquired cattle became part of the same security transaction. Ultimately, most of these cattle were sold but not all of the proceeds were given to the bank for reduction of the secured indebtedness, and the bank sued the defendant commission company, seller, in conversion. Relief was denied and, among other contentions, the bank asserted that its rights were protected under the Uniform Commercial Code. There was no question that the bank had made the necessary filings of record to bring itself within the protection of the code, but the dispositive question was whether the bank, irrespective of its filings of record, had consented to the sale of the cattle covered by the security agreement. The court recognized, 425 P.2d l. c. 730[1], that the bank, "if not expressly consenting to the questioned sales, certainly impliedly acquiesced in and consented thereto. It not only permitted Mr. Bunch, but permitted all its other debtors who granted security interests in cattle, to retain possession of the cattle and to sell the same from time to time as the debtor chose, and it relied upon the honesty of each debtor to bring in the proceeds from his sales to be applied on his indebtedness." It was also recognized, 425 P.2d l. c. 732[7, 8], that "under the code the secured party may consent to the sale of the collateral, and thereby waive his rights in the same. See Official Comment No. 3, § 9–306, and Official Comment No. 2, § 9–307. There being no particular provision of the code which displaces the law of waiver, and particularly waiver by implied acquiescence or consent, the code provisions are supplemented thereby." By way of contrast, see result to the contrary in Commercial Credit Corp. v. Joplin Automobile Auction Co., Mo.App., 430 S.W.2d 440, 443[2], where the security interest was perfected under the code and was not defeated because there was no evidence of acquiescence, consent, waiver, or estoppel.

With the case in this posture, it is unnecessary to discuss, distinguish, and define various terms and provisions of the Uniform Commercial Code.

Nor is it necessary to determine what rights and obligations may exist as between the appellants and between them and Robert T. Smith, d/b/a Campmarina and, in particular, as they may be affected by the asserted alterations in the written instruments, because such matters are not material as between respondent and appellants, and they were neither presented to the court by pleadings and evidence nor were they a part of the judgment under review.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

SEILER, P. J., HOLMAN, J., and HENLEY, Alternate Judge, concur.

BARDGETT, J., not participating because not a member of the court when case was submitted.