In re Gene Thomas WOODS, d/b/a Tom Woods Used Cars, Debtor.

Elizabeth N. LOCKE, Plaintiff,

v.

Gene Thomas WOODS, d/b/a Tom Woods Used Cars, and First Tennessee Bank, N.A., Defendants.

Bankruptcy No. 1–81–00803.
Adv. No. 1–81–0417.

United States Bankruptcy Court,
E.D. Tennessee.

Dec. 22, 1982.

Russell King, Wheat & King, Chattanooga, Tenn., for plaintiff.

Kyle R. Weems, Weill, Ellis, Weems & Copeland, Chattanooga, Tenn., for defendant, Gene Thomas Woods.

Richard B. Gossett, Thomas, Mann & Gossett, Chattanooga, Tenn., for defendant, First Tennessee Bank.

## MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge.

Tom Woods Used Cars sold the plaintiff, Elizabeth Locke, a 1980 Toyota that belonged to James and Diane Brugh. The Brughs had financed their purchase through First Tennessee Bank, which had a security interest in the car. The plaintiff paid for the car but Tom Woods did not pay First Tennessee and obtain a release of its security interest before he and Tom Woods Used Cars filed petitions in bankruptcy. Though the plaintiff took possession of the car, the bank retained the title certificate with its security interest noted thereon. The plaintiff seeks to have her rights in the car held superior to the bank's security interest or, in the alternative, to have Tom Woods himself held liable to her for a debt not dischargeable in bankruptcy.

The court finds the facts as follows.

In October, 1980, James and Diane Brugh bought from Tom Woods Used Cars a 1980 Toyota automobile. First Tennessee Bank financed the Brugh's purchase by buying their installment contract from Tom Woods Used Cars. The Brughs made payments directly to the bank.

The Brughs decided to sell the car in order to pay the debt to First Tennessee

Bank. They had moved to Atlanta and were paying rent there and making payments on a house in Tennessee. Mrs. Brugh was having health problems. The Brughs felt they would be better off if they didn't have the burden of paying for the car.

The contract provided that they would not sell the car without the secured party's written permission. Secured party was defined in the contract to include an assignee, such as First Tennessee Bank.

Mrs. Brugh testified that they took the car to Tom Woods to sell on or about the seventeenth or eighteenth of March, 1981. She testified that the March installment payment had previously been made at about the time she got paid. She was paid on the fifth and twentieth of each month. When asked if the bank's records were correct if they showed payment on the twentieth, Mrs. Brugh said that was too late. Another payment was not due until the middle of April.

Mrs. Brugh wanted to call the bank and tell someone that they were putting the car up for sale at Tom Woods Used Cars, but Tom Woods said he had to call anyway to get the "payoff" so he would know what price the Brughs needed in order to pay the debt to the bank. Mrs. Brugh heard Tom Woods call and ask to speak to Dexter Smith. Of course, Mrs. Brugh could not know to whom Tom Woods was speaking. Tom Woods told whoever it was that he had the car to sell.

According to Tom Woods, the bank's employees like to know why a payoff is requested. Gay McDaniel, a clerk in the loan service department, disagreed. She testified that it is not her policy or department policy to have any discussion not necessary to obtaining the information needed for quoting a payoff. All the bank requires is identification of the loan in question and of the person requesting the payoff. The payoff will be quoted to the owner or anyone who calls and identifies himself as a dealer or an employee of a dealer.

Tom Woods testified that as best as he could remember he talked to Dexter Smith.

Dexter Smith denied talking to Tom Woods about the return or proposed sale of the car. He denied finding out that Tom Woods had the car until after it was sold to the plaintiff. He testified that his department, time sales, usually does not quote payoffs. The loan service department does. He also testified that he usually refers payoff requests to the loan service department because he has difficulty operating the computer. Mr. Smith's records did not show that anyone in the time sales department quoted a payoff to Tom Woods.

The records of the loan service department showed that Betty Goodner quoted a payoff to Tom Woods on March 20. Betty Goodner testified that she didn't remember discussing any details with Tom Woods or whether he told her he had the car. She also testified that she would have written down anything else Tom Woods told her about the car, but her notes only showed that she quoted the payoff.

After the Brughs took the car to Tom Woods, he and Mrs. Brugh discussed the possibility of her trading for or buying a cheaper car to replace the Toyota. Tom Woods was concerned with whether the bank might finance such a transaction for the Brughs. He discussed it with someone at the bank—Dexter Smith, he thought. Whoever it was thought it was a good idea to pay off the debt on the Toyota, since the bank had bought the contract with recourse against Tom Woods, and sell the Brughs a cheaper car, presumably to be financed by the bank without recourse.

Tom Woods testified that he had a habit of talking to Dexter Smith. The Bank was Tom Woods' floor plan financer, and Dexter Smith's department handled the floor plan financing. Dexter Smith usually did the inventory check for purposes of the floor plan financing. He did the check on March 21, 1981. The Brughs' car was not listed on his report for that day. Tom Woods testified that there was no reason for it to be shown on the report since it was not part of the financed inventory. Tom Woods was not certain but thought the Brughs' car was on the lot during one floor plan check and that he pointed it out to Dexter Smith.

Tom Woods also sold repossessed cars for the bank. As far as he knew, he sold all the bank's salable repossessed cars. Tom Woods further testified that there were few days when he did not talk to someone at the bank.

As to financing, Tom Woods usually dealt with Dexter Smith's department. When he only wanted a payoff, Tom Woods would call the loan service department. He testified he asked for a payoff three or four times. The records of the loan service department showed only two requests, the one already mentioned and another made on April 6, during the transaction with the plaintiff.

When he made the last request, Tom Woods apparently asked the loan service department to send the title certificate to time sales. Attached to the title certificate was a note, dated April 6, 1981, from Gay McDaniel in loan services to Rita Johnson in time sales. The note said that Tom Woods has requested the title certificate be sent to time sales because he was going to pay off the note.

The time sales and loan service departments are not the only departments that quote payoffs. Central filing also quotes payoffs, but the loan service department has no record of quotations made by central filing.

The transaction between Tom Woods Used Cars and the plaintiff was conducted mostly by her father acting on her behalf. The plaintiff first looked at the car on Sunday, April 5. On Monday, April 6, the plaintiff's father gave Tom Woods his personal check for the purchase price. Tom Woods agreed to hold the check until Mr. Locke could get a check from his credit union.

The credit union didn't write the check on Monday because it needed more information about the car. On Tuesday, Elizabeth Locke picked up the credit union check and took it to Tom Woods who returned her father's check.

The credit union check was written to Tom Woods Used Cars. It was stamped "For Deposit Only". "Tom Woods Used Cars" and its account number were written in, followed by Tom Woods' signature. Tom Woods said the deposit slip showed Tom Woods Used Cars as a corporation.

Tom Woods gave Elizabeth Locke a bill of sale dated April 6. According to Tom Woods, he gave her this bill of sale only to provide the credit union with the information it needed to write the check. Tom Woods testified that when he obtained the title certificate to the car, he would have furnished Elizabeth Locke an official bill of sale to be used in applying for a new title certificate, and the official bill of sale would have identified Tom Woods Used Cars as a corporation.

The bill of sale provided to the plaintiff is headed "TOM WOODS USED CARS". Tom Woods signed it without any indication that he signed as a corporate officer. It was signed by Elizabeth Locke and appears to have been notarized. The bill of sale also appears to be complete except for Tom Woods' signature on the odometer certification.

Tom Woods did not tell the plaintiff or her father that Tom Woods Used Cars was a corporation. It had been incorporated sometime in 1981 before the sale to the plaintiff in April, 1981.

Tom Woods represented to the plaintiff and her father that he was selling the car for someone in bad health or whose husband was in bad health or had recently died. As already mentioned, Mrs. Brugh was having health problems. Mr. Brugh was not.

Tom Woods told the plaintiff that it would take a few days after the sale for the paperwork to be completed. The plaintiff's father also heard Tom Woods call to get the payoff amount on the car.

After the plaintiff bought the car, her father found, in either the map pocket or the glove compartment, a white copy of an application for a certificate of title. The application showed James and Diane Brugh as the owners and the bank as first lienholder. The plaintiff's father then realized that the bank had a lien on the car. He and

Dexter Smith are old friends. Subsequently he spoke to Dexter Smith several times concerning the certificate of title to the car.

The plaintiff's father at one time worked in collections for a company involved in financing the purchase of household appliances. He was not involved in automobile financing or in the collection of debts secured by automobiles. As to his familiarity with automobile financing, he testified that he had bought cars for himself.

Tom Woods did not endorse the plaintiff's check and deliver it to First Tennessee in payment of the Brughs' debt. On April 9, two days after receiving the check, Tom Woods deposited it in the dealership's checking account at Pioneer Bank. According to Tom Woods, Pioneer Bank on that day began accepting deposited checks for collection only, rather than giving immediate credit. Tom Woods testified that he didn't learn of this change in policy until after the sale to the plaintiff.

Tom Woods believed he wrote a check to pay the secured debt but never sent it to First Tennessee because he knew Pioneer Bank wouldn't honor it.

Tom Woods testified that he didn't deposit the check and pay the debt earlier because he didn't get around to it. He did his paperwork when he had time. In the usual course, his runner would have taken a check to First Tennessee and picked up the title certificate and other documents.

April 25, 1981, was the last Saturday that Tom Woods Used Cars was in business. Dexter Smith spent about eight to nine hours there that day. He accepted credit applications from customers who wanted First Tennessee Bank to finance their purchases. He did not act as a salesman or perform any office work for Tom Woods Used Cars.

Dexter Smith testified that he knew of other arrangements such as that between the Brughs and Tom Woods but he was not advised that the Brughs had taken their car to Tom Woods to sell.

1. Tennessee's version of the Uniform Commercial Code is found in Tenn.Code Ann. §§ 47-1-

*Discussion*

The beginning point of discussion is UCC § 9–306(2): [1]

Except where this chapter otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise. . . .

Section 9–307(1) provides when an unauthorized disposition of the collateral will be free of a security interest:

A buyer in ordinary course of business . . . other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

Buyer in ordinary course of business is defined in § 1–201(9):

"Buyer in ordinary course of business" means person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course of business from a person in the business of selling goods of that kind, but does not include a pawnbroker. . . .

For the plaintiff to prevail under § 9–307, she had to buy from a person in the business of selling automobiles, and the security interest in question had to have been created by her seller. Generally, the Brughs would be considered the creators of the security interest in question. See, e.g., *First American Bank v. Hunning*, 238 S.E.2d 799, 23 UCC Rep.Serv. 225 (Va.1977); *Security Pacific National Bank v. Goodman*, 24 Cal.App.3d 131, 100 Cal.Rptr. 763, 10 UCC Rep.Serv. 529 (1972); *Black v. Schnectady Discount Corp.*, 31 Conn.Sup. 521, 324

101– –9–507.

A.2d 921, 15 UCC Rep.Serv. 519 (App.Div. 1974). On the other hand, it appears that for the purposes of § 9–307(1) Tom Woods should be considered the seller. Thus, the plaintiff has problems in prevailing under § 9–307(1).

Discussion of those problems can be avoided, however, if the plaintiff is correct in arguing that she should prevail under the entrustment section of Article 2 of the UCC. UCC § 2–403(2) & (3).

(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him the power to transfer all rights of the entruster to a buyer in ordinary course of business.

(3) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.

It has been held that if a buyer cannot prevail under § 9–307(1), then the buyer cannot prevail under the entrustment section. *National Shawmut Bank v. Jones,* 108 N.H. 386, 236 A.2d 484, 4 UCC Rep.Serv. 1021 (1967). For the purpose of argument, the court assumes that the plaintiff cannot prevail under § 9–307(1).

■ This court does not agree with the conclusion that a buyer in ordinary course cannot prevail under the entrustment section if she cannot prevail under § 9–307(1). The conclusion is based on statements that support the opposite conclusions as well.[2]

Official Comment 2 to § 2–403 says:

As to entrusting by a secured party, subsection (2) is limited by the more specific provisions of Section 9–307(1), which deny protection to a person buying farm products from a person engaged in farming operations.

Even if the last clause is ignored, this statement still says only that § 2–403(2) applies but is limited by § 9–307(1). When read as a whole, the statement's meaning is obvious. Section 9–307(1) excludes from the class of buyers protected under § 2–403(2) persons buying farm products from a person engaged in farming operations. In other situations § 2–403(2) is not limited by § 9–307(1).

Subsection 2–403(4) is also relied upon as making the entrustment provisions inapplicable when § 9–307(1) applies.

Subsection 2–403(4) provides:

The rights of other purchasers of goods and of lien creditors are governed by the chapters on Secured Transactions ....

This subsection, however, specifically applies to *other* purchasers, meaning purchasers who are not protected by the entrustment provisions, and to "lien creditors", a class that does not include secured parties. UCC §§ 9–301(3) & 9–102.

Finally, the argument against applying § 2–403(2) relies on § 9–306(2), which provides that a sale of the collateral by the debtor is not free of the security interest except as provided in Article 9 or when the secured party authorizes the sale. The argument is that only Article 9 of the UCC can provide exceptions and therefore § 2–403 does not apply.[3]

This overlooks the possibility of entrustment being considered authorization of the sale under § 9–306(2). Such an interpretation presents difficult problems when the debtor returns the collateral to the dealer, without being directed to do so by the secured party and without its knowledge or consent. Entrustment in that situation can only be based on the secured party's acquiescence in the delivery.

The statute provides for entrustment by acquiescence and thereby recognizes that

---

2. Professors White and Summers disagree. J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 23–15, note 100 (2d ed. 1980).

3. In *National Shawmut Bank v. Jones,* cited in the text, the court also referred to § 2–402(3)(a), which is clearly irrelevant since it deals with creditors of the seller, meaning in this case Tom Woods Used Cars, not the Brughs.

the statute may cut off the rights of a party who did not deliver the goods to the dealer. Acquiescence must require that the secured party have notice or knowledge of the debtor's delivery of the collateral to the dealer. A secured party cannot acquiesce in the delivery if it doesn't know about it.

When the secured party knows of the dealer's possession and allows it to continue, a buyer in ordinary course of business should prevail over the secured party. The secured party has in effect given the dealer the opportunity to mislead an innocent buyer.

The bank argues that it could do nothing about the Brughs' delivery of the car to Tom Woods Used Cars. The argument is based on three propositions:

(1) The Brughs were not in default.

(2) The Brughs were therefore entitled to possession against the bank.

(3) The Brughs' right to possession against the bank carried through to Tom Woods Used Cars.

The Brughs' promise not to sell the car without the bank's written permission did not mean the bank had to allow such a sale before it could do anything. If the bank learned of the Brughs' proposed sale without its written permission, the contract allowed it to take some action to stop the sale or retake the car. Otherwise, a debtor's promise not to sell the collateral without the secured party's written permission would be of little value to the secured party.

The bank's argument also overlooks Tom Woods' knowledge of the legal relations between all the parties. Tom Woods doubtlessly knew of the requirement that the Brughs not sell the car without the bank's written permission. Return of the car also made it collateral for Tom Woods' debt to the bank under the recourse agreement. See UCC § 9–306, Official Comment 4. In these circumstances Tom Woods was at least obligated not to sell the car without the bank's authorization.

It is nonsense for the bank to argue that it could not have taken possession of the car even if it had learned that the Brughs' were attempting to sell it in violation of the contract and did not intend to complete the contract if the car could be sold.

The remaining argument is that authorization under § 9–306(2) means authorization as allowed by the contract, which in this case required the bank's written permission.

Section 9–306(2) does not say that authorization means authorization only as allowed by the contract. A sale may be authorized by the secured party despite the debtor's non-compliance with the contract. A requirement that the debtor not sell the car without the secured party's written permission is for the secured party's protection. The secured party can waive the writing requirement or be estopped from relying on it to the detriment of a third party.

The secured party who knows of the debtor's delivery of the collateral to a merchant for sale cannot lie in wait until the merchant has misled some innocent buyer and then recover the collateral on the ground that it did not authorize the sale in writing. Whether viewed as a waiver of the writing requirement or an estoppel, the result is the same—authorization of the sale.

The court believes the law is correctly stated in *Milnes v. General Electric Credit Corp.*, 377 So.2d 725, 27 UCC Rep.Serv. 1428 (Fla.App.1979). See also *Pieper v. First National Bank*, 453 S.W.2d 927, 7 UCC Rep. Serv. 858 (Mo.1979) (§ 2–403(2) not mentioned). The court notes that this creates no large exception to the general rule of § 9–306(2). The problem is determining what degree of action or inaction by the secured party amounts to authorization of a sale otherwise than in accordance with the contract. See *North Central Kansas Production Credit Ass'n v. Washington Sales Co.*, 577 P.2d 35, 23 UCC Rep.Serv. 1343 (Kan.1978); *Central California Equipment v. Dolk Tractor Co.*, 78 Cal.App.3d 855, 144 Cal.Rptr. 367, 23 UCC Rep.Serv. 1051 (1978).

The court is now faced with the difficult question of whether the bank knew about and acquiesced in the return of the car to Tom Woods Used Cars.

The court finds it hard to believe that the bank, through its employees, did not have notice that the car had been returned to Tom Woods Used Cars. The evidence is susceptible to several interpretations but generally leads to the conclusion that the bank had notice of the return of the car.

If Mrs. Brugh correctly remembered that the car was returned on the seventeenth or eighteenth, Tom Woods made at least one request for a payoff that was not in the bank's records presented at the trial. Furthermore, the records presented were only the records of the loan service department. Thus the evidence does not prove that Tom Woods made only two calls.

The proof also suggested that the car may have been returned on the twentieth, the date of the recorded payoff request. Tom Woods could have told Dexter Smith that the car had been returned, and Dexter Smith could have referred the payoff request to the loan services department. In that event, Betty Goodner, who quoted the payoff, would not have been told that Tom Woods had the car.

Furthermore, Dexter Smith's inventory check on the twenty-first would have been the day after the car was returned. Since the Brughs' return of the car was an exceptional, if not unusual, event, Tom Woods certainly would have mentioned it to Dexter Smith if he was at the lot the next day. Indeed, with Dexter Smith present, Tom Woods probably would have pointed out that he had the car even if it had been returned several days before the inventory check. Though Tom Woods was not sure he mentioned the return of the car during the inventory check, it appears likely that he did.

Tom Woods also talked to someone at the bank about financing a trade or another sale for the Brughs, despite their return of the Toyota then financed by the bank. It appears likely that Tom Woods talked to Dexter Smith.

Dexter Smith testified that he did not learn of the return of the car before the sale to the plaintiff. Obviously a person in the position of Mr. Smith has numerous conversations every day concerning transactions in which the bank is involved. In such a position it is important to know when the facts call for action and when they don't. It would be understandable if, on learning that the Brughs had returned the car, Mr. Smith was not particularly alarmed and did not take particular note of what he was told. The Brughs were not in default. The car was salable and was in the possession of the dealer that the bank trusted to sell its repossessed cars and faithfully remit the proceeds. The fact that Mr. Smith did take note when contacted by the plaintiff's father does not show that he lacked any previous notice of the situation.

■ Finally, the bank attempted to prove that the plaintiff was not a buyer in ordinary course of business because she did not buy in good faith and did buy with knowledge that the sale was in violation of the bank's security interest. Both contentions rely on the testimony of the plaintiff's father that he knew the car was being sold for someone else and that he knew someone was owed on the car. This does not show that he knew the sale was in violation of the bank's rights. To so hold would eliminate many innocent purchasers from the protection of the entrustment provisions. A buyer is excluded from being a buyer in ordinary course only if he knows that the third party has rights in the goods *and* that the sale is in violation of those rights. Even allowing for the plaintiff's father's knowledge of automobile financing, neither he nor the plaintiff knew the sale was in violation of the bank's rights.

■ The good faith requirement may impose a higher standard than lack of knowledge that the sale violates someone's rights. The proof, however, did not show that the plaintiff, through her father, acted without "honesty in fact in the transaction." UCC § 1–201(19). Neither the plaintiff nor her father had reason to know that the creditor

with an interest in the car had not consented to the sale.

Under the circumstances, it would be contrary to the policy of the entrustment statute to hold that the plaintiff or her father were obligated to inquire into the arrangements between the owners, Tom Woods, and the bank. The circumstances were not that unusual. The entrustment statute recognizes that a buyer will naturally assume that a merchant can sell his goods free of any third party's rights and will cling to that assumption until either the circumstances become too suspicious to continue the transaction without inquiry or there is evidence that a third party has rights which the seller cannot sell free of.

As to both good faith and lack of knowledge that the sale was in violation of the bank's rights, the decision of the Tennessee Court of Appeals in *Couch v. Cockroft* amply supports the court's conclusions in this case. 490 S.W.2d 713 (Tenn.App.1972).

The court therefore holds that the plaintiff is entitled to the car free of the rights of First Tennessee Bank. Of course, the credit union that financed the plaintiff's purchase is entitled to a security interest in the car.

In light of the above conclusion there is no need to determine whether Tom Woods is liable to the plaintiff for a debt not dischargeable in bankruptcy.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 752.