RAPID CITY PRO. CR. ASS'N, Respondent v. TRANS-
AMERICA INS. CO., Appellant

(184 N.W.2d 49)

(File No. 10776. Opinion filed February 25, 1971)

**Bangs, McCullen, Butler, Foye & Simmons,** Rapid City,
for plaintiff-respondent.

**Overpeck, Hamblin & Mueller,** Belle Fourche, for de-
fendant-appellant.

RENTTO, Presiding Judge.

The plaintiff, a membership association consisting of farmers and ranchers formed under the laws of the United States for the purpose of extending credit to its members for their operations, brings this action to recover from the defendant as surety for Madden's Livestock Market, Inc., of St. Onge, South Dakota, for the wrongful conversion of cattle by Madden's Market. Mr. J. M. Madden was its principal owner and manager. The bond involved is one required by the laws of South Dakota and the United States to secure a license to operate a livestock market agency, and covers only transactions occurring after December 1, 1966.

Ray Smith, a member of the association, with his residence and ranching operations in Lawrence County, South Dakota, became a borrower from it. As security for the funds advanced he mortgaged cattle. From time to time Madden's Market sold groups of these cattle on commission for Smith. The proceeds of a number of such sales were not remitted by Smith to the association. In this action the court found for the association and awarded judgment in the amount due it from Smith. The defendant surety appeals.

The borrowings here involved were initiated by Smith on March 7, 1966 when he borrowed $18,615 and secured it by a mortgage on 133 head of cattle branded with his brand. On August 3, 1966 he obtained an additional loan and executed a supplemental mortgage covering 108 head of mixed yearlings which had been purchased and were to be branded with his brand and 71 calves branded with his brand. On October 24, 1966 he executed another supplemental mortgage covering 113 head of cattle purchased and to be branded. On November 15, 1966 as security for another advancement he executed another chattel mortgage which specifically described 30 head of cows purchased and to be branded.

These mortgages were filed in Lawrence County on March 23, August 4, October 25 and November 17, respectively, all in 1966. Each supplemental mortgage expressly preserved the terms of the original mortgage. All of them antedate the effective date specified in the Uniform Com-

mercial Code, § 10-101, Ch. 150, Laws of 1966, now SDCL 57-40-1.

The first of the eight sales by Madden's Market here involved was made on January 6, 1967, the last on November 10, 1967. In dollar volume they totaled $36,995.08. As to the sales made on January 27, February 10, October 13 and November 10, the defendant contends that the cattle sold were not the property of Smith but were in fact the property of Madden's Market and for that reason were not subject to the mortgage liens. It is admitted that at the auction when these cattle were purchased, they were "knocked down" to Smith, but it is claimed by Smith and Madden that Smith took possession of them under an agreement with Madden to pasture them on shares. Their only proof of this was their oral statements.

As to this issue the court found contrary to defendant's contention. Upon a painstaking review of the record we are not persuaded that such finding is clearly erroneous—that is, we are not left with the definite and firm conviction that in so finding a mistake had been committed. In re Estate of Hobelsberger, 85 S.D. 282, 181 N.W.2d 455. On the contrary we feel that the court was compelled to so find. The written record of the market shows that the cattle, when purchased, were charged to Smith on an open account and the written report of the market given to the consignor shows them as having been sold to Smith. Also, in the market's ledger account with Smith the purchase price of these cattle is included in the amount he owes it.

In an annotation entitled "Auctioneer—Liability for Conversion" in 96 A.L.R.2d 208 at page 212, it is written:

> "According to the overwhelming weight of authority, an auctioneer who sells property in behalf of a principal who has no title thereto or who holds the property subject to a mortgage or other lien, or who for other reasons has no right to sell such property, is personally liable to the true owner or mortgagee for conversion regardless of whether he had knowledge, actual or constructive, of the principal's lack of title or want of authority to sell, in the absence

of facts creating an estoppel or showing acquiescence or consent on the part of the true owner or mortgagee."

Madden's Market does not seem to dispute the correctness of this statement. However, to avoid its application it claims that the association consented to the sales. On this issue the court found that the association did not consent to or authorize Smith to sell the cattle nor did it authorize him to sell them free of the mortgage.

The surety argues that Smith had authority to sell the cattle being obligated only to pay over the proceeds. If such were the case upon a sale occurring there would be a release of the lien even though Smith failed to deliver the proceeds to the association. Under such circumstances the mortgagee is regarded as exchanging his mortgage security for the personal agreement of his debtor. Minneapolis Threshing Machine Company v. Calhoun, 37 S.D. 542, 159 N.W. 127. See also annotation "Chattel Mortgagee's Consent To Sale" 97 A.L.R. 657. But the court found that Smith was not so authorized to sell.

As the latter authority points out the result is different where the agreement of the mortgagee is that in case of a sale of the property he will release his mortgage upon certain conditions. 15 Am.Jur.2d, Chattle Mortgages, § 150. This is not a consent to sell free of the mortgage, but a mere offer of the mortgagee to release the mortgage upon certain conditions being met. In these circumstances the purchaser takes the property subject to liens of which he had actual or constructive notice. Since he takes it so burdened he does not suffer additional prejudice because he is ignorant of the mortgagee's agreement.

The court found the agreement between the association and Smith to be of the latter kind. Under it if Smith sold any of the cattle, he was to inform the purchaser of the existence of the lien and that it would not be discharged until the proceeds of the sales were remitted to the association. Since this finding is not clearly erroneous it is binding on us. That Smith knew this to be their understanding is clear in the re-

cord. In fact he admitted that it was. After selling some cattle in October 1966 he acknowledged this understanding in writing in securing the release of some of the proceeds of the sale of that date.

The defendant further urges that the association acquiesced in these sales by Smith because it had allowed him to make sales of cattle in the usual course of the trade in his own name, the contention being that this course of conduct gives rise to an implied consent to sell. In urging it the defendant relies on its version of the evidence. Obviously the trial court chose to accept the showing of the plaintiff which was to the contrary. This evidence amply supports the finding that the association did not by implication consent to such sales. In its memorandum opinion the trial court observed that it would not give any credibility to Smith's disputed testimony. Moreover, Madden seems to admit that he never relied on such conduct in his dealings with Smith.

The association was not aware of any sales made by Smith before the October 1966 sale although there apparently were some. In December 1966 he sold some cattle and applied the proceeds on his obligation to the plaintiff. It did not know about the January 6, 1967 sale until a week later when Smith called at its office and reported he had used the money. These appear to be the only sales it had learned of. Upon learning of the last of these its manager became upset and berated Smith for violating the terms of his mortgage and secured his promise to repay the money.

It then became suspicious of Smith's conduct and intentions. After this, long distance telephone calls were regularly made to Smith over an extended period inquiring about the repayment of these proceeds and as to whether he was selling any cattle. He denied making any further sale. Beginning in April 1967 the manager of the association and its field inspectors made 18 visits to the ranch in efforts to check the cattle. On these occasions Smith told them that the cattle were up in the hills, not available for inspection, and assured them that he was not selling any of the cattle on which it had a mortgage. This conduct, in our view, does not establish an implied consent for Smith to sell. United States v. Sommer-

ville, 3 Cir., 324 F.2d 712; United States v. Cassidy Commission Company, D.C., 263 F.Supp. 1019; 14 C.J.S. Chattel Mortgages § 262. Establishing this was the burden of the defendant.

Mr. Madden as early as February 1967, and possibly before, knew that Smith was experiencing difficulty with his financial obligation to the association. He told its manager that the association was going to have to take some of the losses. From about April 1, 1967 to January 8, 1968 the association made numerous long distance telephone calls to Madden's Market to find out if Smith was making any sales of cattle through it. The trial court in its memorandum observed that by his answers to these inquiries Madden was deliberately concealing sales made by Smith and that he had a financial interest in so doing until he could reimburse himself from such sales for the debt Smith owed him. He and Smith had many "dealings together".

During the time that the sales in question were being made Madden's Market made advances of money to Smith and carried an open account on its books against him which included the cattle that it claimed had been knocked down to Smith but not sold to him. In addition on one occasion it falsified its record to show that cattle which it knew were offered for sale by Smith had been consigned by a ranch 22, a Madden holding. On the last sale of Smith cattle made through Madden's Market, at Smith's request, it altered its records to show that some of them belonged to and were sold as the property of Mrs. Smith. This was in January 1968 when the association was foreclosing Smith's mortgages.

The trial court in summarizing its view of the record in this regard in its memorandum opinion, referring to Madden as the defendant, wrote the following:

"These facts certainly cannot justify a finding that plaintiff consented to the sales by Smith or in any way waived the security of its chattel mortgages. The mortgages would be good even against a purchaser for value without actual notice of the mortgages, with the filing thereof giving constructive notice. However, as has been noted, defendant had

actual notice of the mortgage, actual knowledge of Smith's conversion of the January 6th proceeds, and of plaintiff's lack of consent thereto. Defendant then concealed numerous sales during the balance of 1967, and applied part of the proceeds of such sales to his own open account with Smith. This is such as to make him an actual participant in Smith's conversion of the proceeds from the sale of the mortgaged cattle."

Our study of the record persuades us that these observations are justified.

█ In our view the court's conclusion that Madden converted the mortgaged cattle involved in the eight sales above mentioned and that the association did not waive its mortgage lien by any form of consent sufficient to amount to a waiver of the liens is justified by the findings which it made. Consequently the judgment appealed from is affirmed.

All the Judges concur.