**CHARTERBANK BUTLER, Respondent,**

v.

**CENTRAL COOPERATIVES, INC., Appellant.**

**No. WD 34442.**

Missouri Court of Appeals, Western District.

March 13, 1984.

John C. Gage, Gage & Tucker, Kansas City, for appellant.

James H. Biddle, McNabb & Pursley, Butler, for respondent.

Before PRITCHARD, P.J., and SHANGLER and BERREY, JJ.

BERREY, Judge.

Plaintiff, CharterBank Butler, [hereinafter bank], brought this action against defendant, Central Cooperatives, Inc., [hereinafter Co-op], for conversion of soybeans in which plaintiff alleged a security interest. Following a non-jury trial the Circuit Court of Bates County entered judgment for the bank in the amount of $37,825.45—interest and costs included. The judgment is reversed.

Daniel and Charles Gardner, dba Gardner Brothers Farms, operated farms in three different Bates County townships.

The Gardners owned 500 acres of farmland and leased an additional 1,300 acres in Deepwater, Spruce and Grand River townships. The leases were not recorded with the Bates County Recorder of Deeds.

To finance their business, the Gardners obtained agricultural loans from the bank [formerly Butler State Bank] commencing in the late 1960's. Collateral for the loans included, among other chattels, cash crops grown in Bates County.

On October 26, 1981, the Gardners executed a security agreement, which renewed an antecedent promissory note, for $250,-000. A financing statement was filed with the Recorder of Deeds in Bates County on October 30, 1981, covering *"all growing crops* and proceeds from such crops after harvest on real estate owned and/or rented by Daniel T. and/or Clarence J. Gardner located primarily in Deepwater, Spruce, and Grand River townships, Bates County, Missouri." (emphasis added.)

Mr. Van Slyke, senior vice-president and a 17 year employee of the bank, visited the farm prior to the note's renewal in October, 1981 and again in early January, 1982. During the later visit he noticed that "[t]he only crop growing was wheat that had been planted that fall." ‑

In January, 1981, the bank had also executed and recorded a security agreement and financing statement covering all growing wheat. The Gardners had received proceeds from the sale of wheat in the summer of 1981. The proceeds were paid to the bank and subsequently loaned back to the Gardner brothers. The Gardner brothers also received a Commodity Credit Corporation disaster payment of $20,000 which was not paid to the bank, but was deposited in their account and used by the Gardner brothers as operating monies.

At the time the renewal note was executed the beans were already being combined and the Gardner brothers had sold $29,600.46 worth to the defendant Co-op before the agreement was recorded.

Mr. Teddy Koontz, the agriculture loan officer for the bank, visited the Gardner brothers on October 16, 1981, to see "[h]ow their crop harvesting progress was coming ..."

Teddy Koontz testified at trial that:

Our normal procedure is to allow the customers to make his own marketing decision unless we specify what manner‑ we want the crop marketed. It is normal to allow the customer to market his own crop and his payment is expected from that crop at the time the note matures. At that time we would expect to have payment on the note.

The bank, according to the testimony, had instructed the Gardner brothers to bring in the proceeds from the sale of any collateral. Defendant's counsel thén asked, "[b]y that did you mean it was all right for them to sell the grain as long as they brought the proceeds in?" Mr. Koontz responded, "I think normal course of business with agriculture customers, that would have been a common practice, *yes.* It had been their practice prior to this time." (emphasis added.)

The land which the Gardner brothers farmed was not only in three townships, but consisted of several different tracts leased from various owners. Koontz testified that he could find the land they owned, but to locate their leased land he "would have to refer to the map and list in the file." A standard township consists of 36 sections of 640 acres each.

Throughout the entire history of the loan, the Gardner brothers continued to market grain and sell mortgaged personal property, and in due course take the proceeds to the bank and either deposit them in their account, or present the proceeds to a bank officer who would write out a deposit slip and credit the Gardner brothers's account. The Gardner brothers would then give a check back to the bank.

On or about December 23, 1981, with the note two days past due, Mr. Koontz, went back to the farm. The harvest was complete except for some late milo.

Koontz then left the farm and checked several local elevators regarding the sale

of grain and determined that Central Co-op of Adrian, Missouri, had purchased some soybeans from the Gardner brothers. Koontz asked for and was subsequently supplied a list of the sales and payments. After advising the Co-op of the bank's lien, Koontz requested that any further checks be made payable jointly to the bank and the Gardner brothers. Prior to that time no such request had ever been made of Co-op by Koontz. At the time of Koontz' visit the Co-op did not have in its possession either soybeans or any proceeds of soybeans sold by the Gardner brothers.

The Co-op assigns several unique points as yet undecided in Missouri, such as what constitutes a growing crop and sufficient identification of real estate. There was evidence presented that the soybeans in question were matured and were a "standing crop" as opposed to a "growing crop." There was also evidence that the particular lands upon which the crops were grown could only be identified by reference to documents not a part of the recorded instrument. Since the case is reversed on other grounds, the court leaves these questions to another time and case.

■ The trial court in its well drawn Findings of Facts and Conclusions of Law properly states the facts but misapplies the law. The trial court found that:

It was the policy of the bank and practice with the Gardner brothers for the Gardner brothers to sell their crops and bring the check from the proceeds of the sale to the bank officer who would deposit the check to the account of the Gardner brothers and receive a check back from them to reduce the loan. It was certainly the policy and practice of the bank to allow the debtor to sell their crops, cattle and other security.

The Co-op contends that the bank's course of conduct permitting the Gardner brothers to sell mortgaged property, personally receive the proceeds, and then deposit them in their account amounted to consent on the bank's part. Therefore, the manner in which the Gardner brothers did business with the bank constituted a waiver of the bank's security interest.

The trial court properly found that the bank's policy and practice was to permit the Gardner brothers "to sell the crops, cattle and other security." In so finding, the trial court erred in declaring that the bank could condition its consent to the Gardner brothers to sell collateral and still retain its security interests.

■ In *Farm Bureau Co-op Mill and Supply, Inc. v. Blue Star Foods, Inc.,* 238 F.2d 326 (8th Cir.1956), the Court of Appeals adopted the proposition of law upon which the case at bar rests when it held; "where the mortgagee authorizes or gives consent to the mortgagor to sell the mortgaged property the mortgage lien thereon is discharged." *Id.* at 332.

The Uniform Commercial Code as adopted by Missouri, provides that:

A security interest continues in collateral notwithstanding sale ... by the debtor unless his action was authorized by the secured party....

Section 400.9–306(2), RSMo (1978). Here, the bank's business relationship with the Gardner brothers repeatedly authorized them to sell collateral. This authorization, express and implied, cuts off the bank's security interest in the collateral notwithstanding their attempt to condition consent upon receipt of proceeds. *Pieper v. First National Bank of Linn Creek,* 453 S.W.2d 926 (Mo.1970). In *Pieper,* the bank and the original boat buyer, against whom a subsequent buyer instituted replevin action, waived their protection under the Uniform Commercial Code by authorizing a boat dealer on their behalf to sell plaintiff the collateral; to wit, the boat in issue.

Even if the court were to find that the bank had a security agreement of value, the express and implied actions of the bank clearly demonstrate authorization to sell the collateral thus destroying any lien interest in the collateral and any support for an action in conversion. Colorado addressed this problem in *First National Bank of Brush v. Bostron,* 39 Colo.App. 107, 564 P.2d 964 (1977), where the court held "[t]he secured party lost its interest under [UCC] 9–306(2) because it had authorized disposition of the grain."

A landmark case, *Clovis National Bank v. Thomas,* 77 N.M. 554, 425 P.2d 726 (1967), is virtually identical to the instant case except it deals with cattle and not soybeans. The court in *Clovis* noted that a definite course of dealing had developed (selling collateral with the bank's knowledge) and that the bank acquiesced in the sale of the cattle covered by a security agreement and this rendered the security agreement unenforceable.

*Farmers National Bank v. Missouri Livestock Commission Company,* 53 F.2d 991 (8th Cir.1931), stands for the proposition that consent may be established by implication arising from a course of conduct as well as by express words and consent to a sale operates as a waiver of the lien or security interest in the collateral. *Id.* at 996–97.

The court in *First National Bank and Trust Company of Oklahoma City, Oklahoma v. Stock Yards Loan Company,* 65 F.2d 226 (8th Cir.1933), made it clear that "[w]hen a mortgagee under a chattel mortgage allows the mortgagor to retain possession of the property and to sell the same at will the mortgagee waives his lien and this is true whether the purchaser knew of the chattel mortgage or not." *Id.* at 229–30.

Finally, in *Moffett Brothers and Andrews Commission Company v. Kent,* 5 S.W.2d 395 (Mo.1928), the court left no doubt as to consent, express or implied, cutting off lien rights of the mortgagee:

> If a mortgagee gives his consent for the mortgagor, who under the terms of the mortgage is permitted to retain the custody, control, care, and management of the mortgaged property, to sell such property, he thereby waives his lien on the property, even though the consent was given upon the express or implied condition that the mortgagor should apply or deliver to the mortgagee to be applied, the proceeds of the sale on the mortgage debt. A consenting by the mortgagee to a sale of the property by the mortgagor and the passing of the title and a retention by him of the mort-

gage lien are wholly inconsistent positions.... By consenting to a sale and the collection of the proceeds by the mortgagor, the mortgagee surrenders his lien and looks to the mortgagor personally for the payment of the mortgage debt.... It is not necessary that such consent in order to constitute a waiver be expressed; it may be implied. Nor is it necessary that the vendee of the mortgagor have knowledge of such consent, or even of the existence of the mortgage. *Accord, Commercial Credit Corp. v. Blau,* 393 S.W.2d 558, 566–567 (Mo.1965); *Midwestern Machinery Company v. G.H. Parsons,* 385 S.W.2d 224, 228 (Mo.App. 1964).

■ Consent, though conditioned upon payment of proceeds to the mortgagee, cuts off the lien. The trial court was correct in finding that the bank gave consent to the Gardner brothers to sell the soybeans, it wrongly applied the law. Thus, the judgment of the trial court is reversed. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). The case is remanded with instructions to enter judgment for the defendant Co-op.

Judgment reversed.

All concur.