**SWIDEN APPLIANCE & FURNITURE, INC., Plaintiff and Appellant,**

v.

**NATIONAL BANK OF SOUTH DAKOTA, EAST BRANCH, Defendant and Appellee.**

**No. 14047.**

Supreme Court of South Dakota.

Argued Oct. 27, 1983.

Decided Oct. 31, 1984.

John E. Burke, Sioux Falls, for plaintiff and appellant; John F. Gridley, III, Sioux Falls, on brief.

Steven W. Sanford of Cadwell, Sanford & Deibert, Sioux Falls, for defendant and appellee.

MORGAN, Justice.

This appeal is from an action brought by Swiden Appliance & Furniture, Inc. (Swiden) against National Bank of South Dakota in Sioux Falls, East Branch (Bank), on alternative counts of negligence and breach of contract. A jury returned a verdict for Bank and Swiden appeals. We affirm.

Alick Swiden is the principal owner of Swiden, a "one man operation." He has been in business and sold goods through retail installment sales contracts since 1937. Between 1937 and 1974, Swiden sold consumer paper to several different banks. In January of 1974, Swiden began selling consumer paper in the form of its retail installment sales contracts to Bank because, according to Swiden, Bank agreed to provide certain collection services. Two documents outlined the parties' relationship.

The parties initially signed a Reserve Agreement under which Bank purchased all acceptable retail installment sales contracts that Swiden offered. This agreement provided for two bookkeeping accounts which could be debited when Bank withdrew funds from Swiden's checking account to make up for payments it did not receive from Swiden's retail installment sales contract customers. When Bank purchased Swiden's contracts, it paid an

amount equal to the principal due on the installment sales contract, less an amount paid into the Holdback Reserve Account, directly into Swiden's checking account.[1] The amount paid into the Holdback Account was separately agreed to between the parties and varied on each sale. The Holdback Account provided a bad debt reserve and was debited when a customer missed a payment.

Under the Reserve Agreement, Bank also set up a Differential Reserve Account. At the time of individual sales, Bank paid a percentage of the interest, or the financing charge due on each retail installment sales contract, into Swiden's checking account and credited the Differential Reserve. When a customer paid off a contract early, the amount of the unearned interest refund was debited to this reserve account. On a monthly basis, Bank received a percentage of the interest not paid into the Differential Reserve account over the life of the contract in consideration for its purchase of the paper. Once a year, Bank was to pay Swiden the amount by which the Differential Reserve exceeded fifteen percent of the total balance outstanding on all notes.

The Reserve Agreement allowed Bank to withhold payments to Swiden from either reserve account if Swiden was in any way indebted to Bank at the time of settlement, and to apply the reserves against any debt Swiden owed Bank. Swiden also agreed that if installments on any contract sold to Bank continued in default for ninety days it would repurchase the contract for an amount equal to the unpaid balance, less any unearned discount. Under the final relevant portion of the reserve agreement, Swiden waived his right to notice of nonpayment, repossession, and all other notices to which he was entitled by law.

The relationship between Swiden and Bank was further set out in a document entitled "Dealer Guaranty of Individual Retail Installment Contract." Swiden filled out and signed a separate individual guar-

antee for each retail installment sales contract that he sold to Bank. Under these agreements, Swiden unconditionally guaranteed that his customer would pay "each and every installment ... when due" and in the event of default Swiden was responsible, upon Bank's demand, for payment of any amount due. Bank could re-draw upon Swiden's checking account for the amount advanced to Swiden on that particular contract and debit one of the bookkeeping accounts, the Differential Reserve Account or the Holdback Reserve Account, as provided under the initial reserve agreement in the event a customer defaulted. Swiden agreed to pay immediately upon demand and waived the right to require Bank to proceed against his customer or the merchandise. Swiden's obligation under the individual guarantees was unconditional, unqualified, and continued until the individual installment sales contract was fully paid.

Early in the Swiden-Bank relationship, in fact by November of 1974, it became apparent that the default and delinquent payment rates on Swiden installment contracts were significantly higher than the same rates on other dealer contracts Bank purchased. Bank stopped purchasing Swiden's contracts in 1978 because of the unusually high rate of default. Bank continued servicing the previously purchased contracts until the last was paid off in February of 1980. At that time, the balances in Swiden's bookkeeping accounts were applied against an unrelated loan obligation Swiden owed Bank and Swiden's bookkeeping accounts were closed.

Toward the end of the relationship, Swiden discovered that Bank had not reassigned some contracts Swiden had repurchased under the recourse provisions of the agreement. At least one had been marked paid and mailed to the retail customer by Bank. In addition, the statute of limitations had run on several contracts, precluding collection.

---

1.  A dealer's finance charge or time price differential and any filing fee or other charge paid by Bank were also deducted from the amount of the unmatured installments to arrive at the amount Bank paid into Swiden's checking account for the individual contracts.

Swiden commenced this action against Bank for breach of contract and negligence claiming (1) that Bank had agreed to collect the contracts but had not informed him it was not doing so, and (2) that Bank had marked contracts paid and returned them to customers. Bank's answers assert the affirmative defenses of estoppel, ratification, contributory negligence, and failure to mitigate. At trial, Swiden's theory changed. At the close of Swiden's case-in-chief, the complaint was amended to conform to the proof. The amended complaint alleged that Bank breached its contracts with Swiden by failing to follow normal standards of the banking industry and that Bank negligently violated banking industry standards. Damages were alleged in the amount of $29,452. At trial, Swiden moved for directed verdict after its evidence was presented. The motion was denied and the case was submitted to the jury. A verdict was rendered for Bank. Swiden moved for judgment non obstante veredicto or, in the alternative, for a new trial. These motions were also denied and Swiden appeals from the judgment and denial of the motions.

Swiden frames the issues as follows: Is Bank liable to a seller/guarantor of a conditional sales contract for damages when Bank takes seller/guarantor's money to pay the contract under recourse and guarantee agreements, marks the contracts paid, and either sends them to the debtor or fails to reassign them to the seller/guarantor? Bank frames the issues as follows: Was the evidence introduced by Swiden and Bank such that reasonable minds could not draw differing inferences and conclusions as to whether (a) Bank breached the contract with Swiden or was culpably negligent for failure to return to Swiden certain installment sales contracts, (b) Bank's conduct was a proximate cause of damage claimed by Swiden, and (c) Swiden was contributorily negligent?

Bank's conduct is the sole issue on this appeal, in that both allegations of Swiden's amended complaint, breach of contract and negligence are based on Bank's alleged failure to follow normal accepted standards of the banking industry. We will, however, consider the allegations separately.

▪ In support of his breach of contract argument, Swiden first cites SDCL 57A–1–205(3) [2] for the proposition that the only contracts formed between the parties were later supplemented and qualified through normal custom and usage in the trade and through a specific course of dealing between Swiden and Bank. The breach of contract question thus centers around the form of the contracts as well as the express terms of the two agreements. The existence and scope of a trade usage or course of dealing are questions of fact to be determined by the fact finder. *Superior Foods, Inc. v. Harris-Teeter Super Markets*, 288 N.C. 213, 217 S.E.2d 566 (1975). The jury did not find a usage of trade that superseded the original agreement in this case. In any event, obligations created under course of dealing and usage of trade are subordinate to any terms of an express agreement with which the parties' conduct or a trade usage disagree. SDCL 57A–1–205(4); *see United States v. E.W. Savage & Son, Inc.*, 343 F.Supp. 123 (D.S.D.1972) (decided under South Dakota law that writings control over usage of trade or course of dealings). In this case, the written contract is embodied in the Reserve Agreement and the separate dealer guarantees of individual retail installment contracts. SDCL 57A–1–205(4) provides:

(4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but *when such construction is unreasonable express terms control both course of dealing and usage of trade and course of*

---

**2.** SDCL 57A–1–205(3) provides:
(3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are

or should be aware give particular meaning to and supplement or qualify terms of an agreement.

*dealing controls usage of trade.* (Emphasis supplied.)

Under the Reserve Agreement and the individual guarantees, Swiden was "unconditionally," "absolutely," and "unqualified[ly]" obligated to pay Bank the amount of any defaulted or delinquent installments. The Reserve Agreement subordinated Swiden's right to the fund in his checking account that was related to the balance of the Reserve Accounts to Bank's right to set off for any indebtedness, direct or indirect, that Swiden owed Bank. Missed and delinquent installment payments guaranteed by Swiden under the recourse clause and indemnity clause thus became an indebtedness to Bank that could properly be offset and deducted from Swiden's accounts under the terms of the written contracts. Under these express contracts, Swiden also waived his right to notice of nonpayment, repossession, and all other notices. Consequently, in light of the clearly expressed Reserve Agreement terms covering Bank's rights and obligations, the testimony and evidence Swiden offered at trial to show that the standard of conduct and the usage in the trade constituted the contract was irrelevant and immaterial.[3]

The written guarantees specifically precluded both prior and potential unwritten agreements from superseding the individual guarantees. Swiden's liability under the Dealer Guaranty of Individual Retail Installment Contract that was signed upon the sale of each contract, could not be modified and Swiden was liable under those agreements for any default on any of his contracts, "without respect to any other agreements ... unless specifically agreed otherwise in writing." The usage of trade and course of dealing that Swiden asserts cannot rise to the level of a contractual obligation between these parties.

The two written documents did not impose any conditions or obligations upon Bank to collect accounts or return contracts. Bank's alleged oral agreement to collect Swiden's accounts and the custom of returning contracts testified to at trial are simply not consistent with the written agreements that Swiden signed and those agreements do not obligate Bank to a specific custom or usage. The express terms of the contracts control in the face of inconsistency. SDCL 57A–1–205(4). We affirm on this issue.

The negligence count also revolves around Bank's compliance or noncompliance with the standard of care in the banking industry and normal banking practices. Swiden's contention that Bank admits it violated "normal accepted banking practices and usage" is not supported by the trial transcript. Dave Hanten (Hanten), the bank manager, explained what he considered the normal banking procedure when consumer paper goes bad and is returned without recourse. While he admitted that Bank did not follow this "normal" procedure, he did not say that he considered this to be a normal situation. Swiden refers to SDCL 57A–4–103(5) as Bank's standard of care and the proper delineation of Bank's duty to Swiden. Article 4 of the Uniform Commercial Code covers bank deposits and collections, the payment or nonpayment of items, drafts and checks by depository, payor, intermediary and collecting banks. This case involves the sale of retail installment sales contracts and does not fall within the scope of SDCL ch. 57A–4. SDCL ch. 57A–9, Secured Transactions, controls this case. SDCL ch. 57A–9 applies to any sale of accounts or chattel paper. SDCL 57A–9–102(1)(b). SDCL 57A–9–104(f) provides an exclusion for contracts or chattel paper sold or assigned for the purpose of collection only. The sale of chattel paper in this case was not, however, for the purpose of collection only. A "collection only" assignment is a transaction that does not involve the advance of money. *Daly v. Shrimplin*, 610 P.2d 397 (Wyo.1980). In this case, Swiden received

---

**3.** Even if Swiden had established a usage of trade that correctly delineated Bank's standard of conduct here, the course of dealing between Bank and Swiden, to which Swiden at least acquiesced, would supersede as the proper standard of conduct. SDCL 57A–1–205(4).

the balance due on each contract, less the reserve amounts, at the time it sold the contract to Bank. Thus, Bank advanced money to Swiden and SDCL ch. 57A–9 applies. The principles set out in SDCL ch. 57A–1 apply to all of the chapters in Title 57A. SDCL 57A–1–205 provides that when express terms are inconsistent with an applicable course of dealing or usage of trade, the express terms control. SDCL 57A–1–205(4). The course of dealing between Swiden and Bank controls over the usage of other banks in discerning a standard. SDCL 57A–1–205(4). At trial, Bank primarily took the position that it had not violated its obligations under the express written agreements, the course of dealing between itself and Swiden, or the standard of conduct for the industry. In support of its position, Bank presented the testimony of a number of Bank employees who had worked on Swiden's account to show that Bank did all it could reasonably be expected to do in compliance with the proper standard and the written contracts Swiden signed.

Although Swiden testified at trial that his memory was vague and he did not recall signing any contracts with Bank or reviewing statements with Bank employees, he did recall receiving monthly bank statements. In opposition to Swiden's vague memory, Bank introduced three loan officers who testified regarding their working relationships with Swiden. Tom Marchetti (Marchetti) handled Swiden's account and consumer paper for Bank from 1974 to 1976. Marchetti testified that during that time he telephoned or personally visited Swiden to discuss past due and defaulted retail installment contracts before Swiden honored his guarantees by making payment on those contracts. Marchetti also telephoned Swiden's customers to request payment and he called upon Swiden only when an account was deemed uncollectable. Marchetti also identified letters he sent Swiden in which he enclosed contracts that were reassigned to Swiden and debited to his account. These letters notified Swiden of certain delinquent installments for which his account was debited.

Jim Crawford (Crawford), a collector for Bank from 1975 to 1976, testified that when accounts became delinquent he either telephoned Swiden or visited him. Swiden either made the payments in cash and it was credited against the individual contract account, or Swiden requested that it be charged against his checking account. Like Marchetti, Crawford identified letters he sent to Swiden regarding debits to Swiden's account for installment payments on dealer contracts. Howard Priesz (Priesz) worked for Bank and collected on Swiden accounts for about six months. Priesz testified that Swiden's account was debited for delinquent and defaulted installments only when Bank's collection efforts failed. Priesz also testified that before accounts he worked on were debited for delinquencies or defaults Swiden or one of his employees was contacted personally to determine which accounts would be debited.

Terry Kappes (Kappes) worked at Bank's East Branch from 1977 to 1978 and made collections on Swiden customer contracts. He sometimes debited the Swiden checking account for past due payments and he explained the process involved in debiting the account. First, a debit ticket including the preparer's name, the total dollar amount, the customer account numbers with the individual dollar amounts, and the customers' names was prepared. Second, Swiden or an employee was contacted, usually by telephone, and told which accounts were debited. Third, a credit entry corresponding to the debit was made and the original debit slip went to the individual accounts with the credits. A copy of the debit ticket was then sent to Swiden. Handwritten abbreviations on the back of some of the debit ticket copies mailed to Swiden indicated that he or an employee had been aware of the debits to his checking account which were indicated on the slips. Finally, the original debit slips were returned to Swiden with his monthly bank statement. The debits were made all at once at month's end; one debit was done for all of the accounts that became over thirty days past due during that month. Therefore,

debit slips typically showed a total on the front and a list of individual customer names and amounts on the back.

Finally, Renae Goltz (Goltz), who worked for Bank on Swiden's accounts from 1975 to 1978, testified that Bank provided Swiden with a weekly computer printout listing his delinquent accounts and each customer's amount past due. She stated that she spoke with Swiden at least weekly and also periodically over the phone. As a counterpoint to Swiden's vague memory, Goltz kept written notes on each customer she collected from and the amount debited to Swiden's account for the payment. She refreshed her memory from those notes. Goltz testified that Swiden directed her to debit his checking account for payments he made on his customers' contracts, for payments his customers made directly to him, and for payments made on contracts after Swiden repossessed the merchandise. Goltz also testified that she had returned defaulted contracts to Swiden. The jury determines the witnesses' credibility. *Finch v. Christensen*, 84 S.D. 420, 172 N.W.2d 571 (1969). In this case, the jury chose to believe Bank's witnesses.

▆▆▆▆ Hanten, Bank's manager, testified that Swiden had a copy of each contract and had access to all of the contract originals whenever he wanted them. Hanten further testified that Swiden could have called the bank at any time and found out the balance of his reserve accounts, the extent of debits against his checking account, and the individual customer responsible for the debit. The written agreements are unclear as to whether Bank or the customer was to get the retail sales contracts after the installments were paid. In this case, possession of the original retail installment sales contracts was irrelevant. *See* SDCL 19-18-3. Swiden's right to recover any guarantee or default payments from his customers was not defeated by Bank's inadvertent return of the contract original to the retail customer. *Peoples Bank of South Carolina, Inc. v. Robinson*, 272 S.C. 155, 249 S.E.2d 784 (1978). When Swiden made the payments, he ac-quired an immediate right of action against his defaulting retail customer regardless of who held the original installment sales contract. *O.K. Door Company v. Lincoln Engineering Const. Co.*, 174 Neb. 682, 119 N.W.2d 153 (1963).

The testimony and evidence presented at trial clearly show that Swiden was repeatedly able to collect payments, obtain returns and repossess collateral without possession of the original contract. *See* SDCL 19-18-3. Witnesses for both parties, Hanten for Bank and Carrol Flowers of United National Bank for Swiden, testified that the procedures and mechanics of consumer paper sales vary from bank to bank and there is no generally accepted banking practice or established standard of care. The standard is especially difficult to pin down when the customer makes some payments on the contract and the dealer makes others. Swiden could not foreseeably have been damaged by Bank's failure to return the contracts to Swiden or by Bank's return of the contracts to the retail customers. Swiden was free to collect on the contracts at any time. We affirm on this issue.

▆▆▆▆ A motion for judgment notwithstanding the verdict relates back and is based upon the motion for directed verdict made at the close of the testimony. *Raebel v. Fishers Grove Golf Course, Inc.*, 88 S.D. 20, 214 N.W.2d 785 (1974); SDCL 15-6-50(b). A directed verdict is proper only when the evidence is undisputed or such that reasonable minds could not draw different inferences or conclusions from the facts. *Fajardo v. Cammack*, 322 N.W.2d 873 (S.D.1982). Swiden moved for a directed verdict on the question of liability only and wanted to leave the damages question to the jury. Swiden would have thereby put the issues of proximate cause, contributory negligence, and breach of contract before the trial court. These legal conclusions rest upon substantial issues of material fact that are rightfully jury questions. In this case, the determination of whether Swiden's alleged loss was caused by Bank's failure to return the contracts, by Swiden's

failure to ask for them, or by Swiden's failure to pursue readily available legal remedies, were issues of fact for the jury to determine. There was considerable dispute in the evidence on these issues. The credibility of the witnesses was for determination by the jury. *Finch v. Christensen, supra.* The denial of Swiden's directed verdict motion and motion for judgment n.o.v., or for a new trial, was proper and the trial court's order is affirmed on that issue.

WOLLMAN and HENDERSON, JJ., and DUNN, Retired Justice, concur.

HOYT, Circuit Judge, acting for FOSHEIM, C.J., concurs.

WUEST, Circuit Judge, acting as Supreme Court Justice, not participating.