ABERDEEN PRODUCTION CREDIT
ASSOCIATION, a corporation,
Plaintiff and Appellant,

v.

REDFIELD LIVESTOCK AUCTION,
INC., a corporation, Defendant
and Appellee.

ABERDEEN PRODUCTION CREDIT
ASSOCIATION, a corporation,
Plaintiff and Appellant,

v.

FT. PIERRE LIVESTOCK AUCTION,
INC., a corporation, Defendant
and Appellee.

ABERDEEN PRODUCTION CREDIT
ASSOCIATION, a corporation,
Plaintiff and Appellant,

v.

Charles J. ANDERBERG, d/b/a Miller
Livestock Sales Co., Defendant
and Appellant.

ABERDEEN PRODUCTION CREDIT
ASSOCIATION, a corporation,
Plaintiff and Appellant,

v.

Darold MENTZER, d/b/a Kimball
Livestock Exchange, Defendant
and Appellee.

ABERDEEN PRODUCTION CREDIT
ASSOCIATION, a corporation,
Plaintiff and Appellant,

v.

CHAMBERLAIN LIVESTOCK AUC-
TION, INC., a corporation,
Defendant and Appellee.

Nos. 14819, 14844, 14821, 14845, 14822,
14840, 14833, 14841, 14834 and 14842.

Supreme Court of South Dakota.

Argued Sept. 9, 1985.

Decided Dec. 24, 1985.

Rehearing Denied Feb. 3, 1986.

**830**

Carlyle E. Richards, P.C., Aberdeen, for plaintiff and appellant.

Rory King of Siegel, Barnett & Schutz, Aberdeen, for appellees Redfield Livestock Auction, Inc., a corporation, and Ft. Pierre Livestock Auction, Inc., a corporation.

James M. Cremer of Bantz, Gosch, Cremer, Peterson & Oliver, Aberdeen, for appellees Charles J. Anderberg, d/b/a Kimball Livestock Exchange, and Chamberlain Livestock Auction, Inc., a corporation.

Thomas C. Adam of May, Adam, Gerdes & Thompson, Pierre, for S.D. Bankers Ass'n, Inc., amicus curiae.

FOSHEIM, Chief Justice.

Aberdeen Production Credit Association (PCA) brought separate conversion actions against five South Dakota livestock auction companies or their owners (sale barns) for selling cattle in which PCA had a perfected security interest. Summary judgments were entered against PCA in all cases, which have been consolidated on appeal. We reverse.

During 1981, Bellman Farms, Inc., (Bellman Farms) was indebted to PCA for approximately a million and a half dollars. Various notes were executed by Bellman Farms and Ace Cattle Company, a tax shelter owned solely by the shareholders of Bellman Farms. The notes were secured by over 3,000 head of cattle. "Financing statements" covering the cattle, their increase, proceeds, and products and feed were filed with the Faulk County Auditor and the South Dakota Secretary of State. Under the terms of the security agreements, Bellman Farms is not to sell, assign, or transfer secured property without PCA's written consent. The security agreements also contain a nonwaiver provision which provides that PCA's failure to strictly enforce performance of any covenant or condition does not operate as a waiver of PCA's right to later require strict conformance with a term or condition.

In 1981, PCA became increasingly concerned with the Bellman Farms loan and notified Bellman Farms that the balance of the indebtedness would be due in December of that year. The indebtedness was not paid. Bellman Farms petitioned for a chapter 11 reorganization under the federal bankruptcy code in early December, 1981.

In late 1981, PCA learned that Bellman Farms had sold secured cattle without remitting the proceeds to PCA. Written consent from PCA was not obtained by either Bellman Farms or any of the sale barns in the farm's behalf prior to these sales. PCA accordingly brought these actions in conversion against the different sale barns.

The appeal rests on two basic issues: I. Did PCA expressly consent to the sales in the cash-flow projections and other internal documents? II. By its course of dealing with Bellman Farms, did PCA implicitly waive the written consent requirement contained in the security agreements?

▪ A review of an order granting summary judgment leads to an affirmance if any basis exists which supports the ruling. The evidence must be viewed most favorable to the nonmoving party. The burden of proof is on the movant to clearly show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *Feistner v. Swenson*, 368 N.W.2d 621, 622 (S.D.1985). We are not, however, bound by the facts as found by the trial court. *Wilson v. Great Northern Railway Co.*, 83 S.D. 207, 157 N.W.2d 19 (1968). Instead, we conduct our own review of the record to determine whether a genuine issue of fact exists. *Id.* at 211, 157 N.W.2d at 21. We also review the legal conclusions reached by the trial court. *Bennett v. Jansma*, 329 N.W.2d 134 (S.D.1983).

▪ The security agreements required PCA's prior written authorization for Bellman Farms to sell the secured cattle. In selling the cattle the sale barns were acting as agents for Bellman Farms. *First National Bank v. Siman*, 65 S.D. 514, 275 N.W. 347 (1937). Under SDCL 57A–9–306(2), the burden is on sale barns to show that authorization to sell was given by PCA in the "[1] security agreement or [2] otherwise" if they are to prevail. *United States v. E.W. Savage & Sons, Inc.*, 343 F.Supp. 123 (D.S.D.1972). We therefore initially determine whether authorization to sell was given in the security agreements.

▪ In paragraph nine of the security agreements Bellman Farms clearly agreed not to "sell, assign or transfer said property or any part thereof without the *written consent* of the Secured Party ..." (emphasis added). The sale barns urge the court to find that the requisite written authorization was not on the face of the security agreements but in the various related cash flow statements, loan applications and attachments executed between Bellman Farms and PCA. We note, as have the sale barns, that PCA employees labeled these documents as authorization or written consent for sale of cattle. However, we do not characterize these statements or documents as constituting consent to the particular sales made by Bellman Farms through the individual sale barns during 1981 or as a waiver of PCA's security interest in the cattle or proceeds. These internal documents recognize the business plans and sale projections for Bellman Farms throughout the year but nothing more. Obviously, PCA understood and anticipated that Bellman Farms could meet the December, 1981, called due date only by selling secured cattle at the most advantageous market but it does not follow that PCA thereby expressly or implicitly expected anything less than full compliance with the security agreement or, in the absence of advance written consent, that Bellman Farms could pocket the proceeds. The alternative would mean that whenever a lendor executes a standard cash flow or repayment projection with a borrower, a written consent to sell and a security interest surrender is established. That would emasculate, if not totally negate, the purposes and objectives of the parties.

▪ We next consider whether certain acts of PCA resulted in an "otherwise" authorization to sell the cattle. The sale barns argue that continued representations and demands for sale of cattle by the PCA or PCA's failure to chastise Bellman Farms for selling cattle on prior occasions without written consent resulted in an "otherwise" authorization as recognized by SDCL 57A–9–306(2).[1] It is important to note that the

1. Sale barns' contention that "course of performance" established consent is without merit.

prior sales were followed by prompt application of the proceeds on the loan. Under SDCL 57A–1–205(4), "[t]he express terms of an agreement and an applicable course of dealing or usage of trade shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable expressed terms control both course of dealing and usage of trade. . . ." To construe PCA's various actions as consent for sale and release of their security interest is unreasonable and inconsistent with the express terms of the security agreement which required written consent. It follows that the security agreement's requirement controls and PCA did not "otherwise" authorize sale of the cattle and their security interest continued, as provided in SDCL 57A–9–306(2).

■ Further, we find no course of dealing on which the sale barns can rely to show that PCA waived its security interest.[2] The previous course of dealing amounted to nothing more than PCA's failure to impose some form of creditor discipline against Bellman Farms for selling cattle on prior occasions without written consent. Considering the fact that these particular sales were made without PCA's knowledge, sale barns' argument that PCA failed to protect itself ignores reality. *Wabasso State Bank v. Caldwell Packing Co.*, 308 Minn. 349, 354, 251 N.W.2d 321, 324 (1976). When Bellman Farms sold secured cattle and paid over the proceeds to PCA, PCA was presented with an accomplished fact. Since PCA was not prejudiced by such sales, to now argue that PCA's failure to nevertheless rebuke Bellman Farms or to call the loan constituted a waiver of the security agreement in the subsequent, unreported sales is not persuasive.

■ We must assume that SDCL 57A–9–306(2) was drafted in recognition of the realities of our agricultural financing system, the constant marketing of secured farm products, and the practical problems associated with agribusiness. *See Garden City Production Credit Association v. Lannan*, 186 Neb. 668, 670, 186 N.W.2d 99, 101 (1971). The sale barns, acting as Bellman Farms' agents, had constructive notice (i.e., notice imputed to them by law, SDCL 17–1–3) of security agreements filed pursuant to statute. SDCL 57A–1–201(25) and (26), and SDCL ch. 57A–9. *See also Shelby v. Bowden*, 16 S.D. 531, 94 N.W. 416 (1903); *Parrish v. Mahany*, 10 S.D. 276, 73 N.W. 97 (1897). The sale barns failed to heed that notice at their peril. *Parrish*, 10 S.D. at 284–85, 73 N.W. at 99.

This is not the first time we have similarly construed SDCL 57A–1–205(4). *Swiden Appliance and Furniture, Inc. v. National Bank of South Dakota*, 357 N.W.2d 271 (S.D.1984). In *Swiden*, we held that obligations created under a course of dealing and usage of trade are subordinate to any terms of an express agreement with which the parties' conduct or trade usage disagree. *Id.* at 274. "The expressed terms of the contracts control in the face of inconsistency. SDCL 57A–1–205(4)." *Id.* at 275.

■ Finally, but perhaps most controlling, we find that PCA did not waive its security interest in the proceeds of the sales. The security agreement covered proceeds and proper financing statements perfected PCA's interest in the proceeds. Even assuming that PCA consented to the sales of cattle as the sale barns maintain, the security interest in identifiable proceeds was nevertheless retained. *See* SDCL 57A–9–306(2) and *Humboldt Trust & Savings Bank v. Entler*, 349 N.W.2d 778 (Iowa App.1984).

■ By Notices of Review, sale barns present additional issues on appeal. Since the circuit court in each case granted summary judgment to the sale barns, these

"Course of performance" is a sales associated term. *See* SDCL 57A–2–208(2). *Compare* SDCL 57A–1–205(4).

2. Sale barns were not privy to the course of dealing between PCA and Bellman Farms. Moreover, they cannot claim knowledge of any course of dealing on which they relied in failing to check for a perfected security interest. *See Garden City Production Credit Association v. Lannan*, 186 Neb. 668, 674, 186 N.W.2d 99, 103 (1971); *Wabasso State Bank v. Caldwell Packing Co.*, 308 Minn., 349, 354, 251 N.W.2d 321, 324 (1976).

questions involve issues of fact which were not reached. As an appellate court, we are without jurisdiction to determine issues of fact or direct a decision to the trial courts except where facts are undisputed and such that only one conclusion can be drawn. *Baken Park, Inc., v. County of Pennington*, 79 S.D. 156, 164, 109 N.W.2d 898, 902 (1961). The record is insufficient to direct entry of summary judgments for PCA.

From a review of the record, we conclude that the lower courts erred as a matter of law in finding that PCA waived their security interest in Bellman Farms cattle or the sale proceeds in "the security agreement or otherwise" under SDCL 57A–9–306(2). We accordingly reverse and remand in all of the cases.

MORGAN, J., and WUEST, and HERTZ, Acting J., concur.

HENDERSON, J., dissents.

HENDERSON, Justice (dissenting).

As the muscle of the railroads began to weaken in the 1940's through excessive regulation and taxation of government; and as the highways of this state, through the power of the people's purse, vastly improved; and as the trucking industry began to flourish by the use of these modern highways and the industrial might of Detroit; and as the demand for a place to sell livestock grew, rather than to train livestock to Omaha, Nebraska, or to Sioux City, Iowa, a new and vital industry was birthed in this state. We South Dakotans saw sale barns, sometimes known as livestock pavilions, crop up across our state and we also saw them develop in our sister states and down into the great Southwest. It was wartime then. It was dreadfully important that livestock be marketed. Consumers, our troops, allies, and the producer all benefited from the livestock producer and the livestock sale pavilions. Today, as back in the 1940's, these livestock sale barns serve a great public need. Livestock can no longer be shipped into the great railway centers. Therefore, the country sale barn has become a mecca for the livestock producer, big and small, to sell his livestock. These livestock sale barns must be given a fair shake in the law lest they perish. If they perish across this state, many of our producers (farmers and ranchers) will be relegated to selling their livestock directly to the packing plants or mammoth corporate entities specializing in the purchase and sale of meat. Therefore, I take a dim view of jeopardizing the sale barns in this state. Needless to say, this opinion has a significant economic impact upon them. Believing this opinion is founded upon errors of law, I respectfully dissent.

This decision is basically unfair to the sale barns of the State of South Dakota. This decision reverses judgments secured by several livestock sale barns and reverses the combined judgments of several distinguished circuit judges of this state whose decisions were arrived at independently after considered reflection and are now reversed in a consolidated appeal.

It is my opinion that the main body of law in the U.S.A. favors the position of the sale barns and is opposed to the position of the Production Credit Association. Production Credit Association seeks to take advantage of these sale barns by virtue of being a secured party and relying upon its security agreement. However, the true facts of this case reveal a typical "fine print" offense by a lending institution which defies all truth, all reason, and all logic in this case. Production Credit Association admits that it consented to the sales both in conduct and by written document, but now it argues before the highest Court of this state that it did not waive the security agreement on file. The plain truth of this case is that the Production Credit Association saw fit and chose to ignore its own written agreement. Production Credit Association, from time to time, did not believe that Bellman was selling the cattle fast enough. Production Credit Association wanted Bellman to sell the cattle "within cash flows." Production Credit Association permitted Bellman to collect the proceeds of the sale of these cattle in his own name. All of this is substantiated by the depositions on file herein. The circuit

court judges read these depositions and knew what they were doing. In fact, the record discloses that the Production Credit Association absolutely violated its own written security agreement 83 times by 83 separate sales and received these 83 sales slips. These 83 sales of cattle, with the Production Credit Association actually encouraging a liquidation of this herd, took place over a period of three years.

Under South Dakota law and the facts and circumstances of this case, the Production Credit Association did not retain a security interest in the cattle or proceeds. Thus, the Production Credit Association could not maintain these separate conversion actions and summary judgments were properly entered against it. I reach this conclusion for three reasons.

First, under SDCL 57A–9–306(2), a security interest in collateral and its proceeds is discontinued if the debtor disposes thereof and the debtor's actions were authorized by the secured party in the security agreement or otherwise. In the present case, cash flow projections and statements, and various loan applications and attachments, were labeled by the Production Credit Association employees as *authorization or written consent for sale of cattle.* These documents, as denominated by the Production Credit Association itself, and despite the majority's characterization, constituted written authorization by the secured party for the sale of the cattle and thus discontinued the security interest in the cattle and the proceeds. Such a conclusion does not emasculate the parties' purposes and objectives and does not transform a "standard cash flow or repayment projection" (which is not denominated by the secured party as an *"authorization or written consent for sale "*) into a written consent to sell and a surrender of the security interest.

Second, and additionally, by prior course of dealing, the Production Credit Association had permitted Bellman Farms to sell secured cattle through livestock sale pavilions. This conduct or course of dealing, constituted an "otherwise" or implied authorization within the purview of SDCL 57A–9–306(2), to sell the secured cattle and thereby discontinued the Production Credit

Association's security interest in the collateral and its proceeds. Western Idaho PCA v. Simplot Feed Lots, Inc., 106 Idaho 260, 678 P.2d 52 (1984). The course of dealing between the secured party and the debtor can result in a waiver or implied consent and authority to sell free of the security interest. *State Bank, Palmer v. Scoular-Bishop,* 217 Neb. 379, 349 N.W.2d 912 (1984). *See also, Planters PCA v. Bowles,* 256 Ark. 1063, 511 S.W.2d 645 (1974); *Humboldt Trust & Savings Bank v. Entler,* 349 N.W.2d 778 (Iowa App.1984); *Clovis Nat'l Bank v. Thomas,* 77 N.M. 554, 425 P.2d 726 (1967); *Benson County Co-op. v. Central Livestock Ass'n,* 300 N.W.2d 236 (N.D.1980); *Poteau State Bank v. Denwalt,* 597 P.2d 756 (Okla.1979). Thus, the sale barns are relieved of conversion liability upon a showing of acquiescence or consent to the sale on the part of the secured party. *Rapid City PCA v. Transamerica Ins. Co.,* 85 S.D. 395, 184 N.W.2d 49 (1971). The fact that the proceeds of such prior sales were paid over to the Production Credit Association and the present Bellman Farm's proceeds were not, does not abrogate the Production Credit Association's waiver or discontinuance of the security interests. *See Parkersburg State Bank v. Swift Ind. Packing Co.,* 764 F.2d 512 (8th Cir.1985). A "conditioned" consent, if the Production Credit Association's prior course of dealing can be so characterized, and the failure of such condition, does not prevent the security interest's discontinuance or waiver. *Accord First Nat'l Bank & Trust Co. v. Iowa Beef Processors, Inc.,* 626 F.2d 764 (10th Cir.1980); *Moffat County State Bank v. Producers Livestock Marketing Ass'n,* 598 F.Supp. 1562 (D.Colo.1984); *Western Idaho Production Credit Ass. v. Simplot Feed Lots,* 106 Idaho 260, 678 P.2d 52; *Anon, Inc. v. Farmers PCA,* 446 N.E.2d 656, 37 A.L.R.4th 776 (Ind.App.1983); *Ottumwa PCA v. Keoco Auction Co.,* 347 N.W.2d 393 (Iowa 1984); *Peoples Nat'l Bank & Trust v. Excel Corp.,* 236 Kan. 687, 695 P.2d 444 (Kan. App.1985); and *Charterbank Butler v. Central Cooperatives, Inc.,* 667 S.W.2d 463 (Mo.App.1984).

Third, where one of two entities must suffer by the act of a third, the one which enabled such entity to occasion the loss must suffer. *Nat'l Livestock Credit Corp. v. Schultz*, 653 P.2d 1243 (Okla.App.1982). Here, as between the Production Credit Association and the sale barns, the Production Credit Association should bear the loss. The Production Credit Association's lax enforcement of the security interest's terms and its acquiescence in Bellman Farm's sale of secured cattle furnished the circumstances occasioning the loss herein. Therefore, they should bear that loss. *See Ottumwa PCA v. Keoco Auction Co.*, 347 N.W.2d 393. The Production Credit Association elected to allow Bellman Farms to sell the cattle without complying with the security instruments and it cannot now rely on those same instruments to hold the sale barns liable. The Production Credit Association made its own bed; let them sleep in it. Call it country justice. Therefore, conversion against these sale barns does not lie as a matter of law and there is no question of fact. I would accordingly affirm the various circuit court summary judgments entered herein.