ZINTER, Justice.
[¶ 1.] These consolidated appeals arise out of separate but related actions for conversion. Both actions were commenced by Fin-Ag, Inc., an agricultural lender, against two public livestock auction barns: Pipestone Livestock Auction Market, Inc. (Pipestone) and South Dakota Livestock Sales of Watertown, Inc. (SD Livestock) (collectively referred to as Sale Barns).[1] Fin-Ag alleged that it had a perfected security interest in cattle sold at Sale Barns under the name C & M Dairy, and that Sale Barns converted the collateral by failing to remit the sale proceeds to Fin-Ag. In the action against Pipestone, the circuit court (Judge Kean, Retired) granted summary judgment in favor of Fin-Ag on some sales and in favor of Pipestone on other sales. In the action against SD Livestock, the circuit court (Judge Timm) granted summary judgment in favor of *34 Fin-Ag. The principal difference between the courts’ rulings involves different interpretations of the Food Security Act (FSA), 7 U.S.C. § 1631 (1985). We agree with the Pipestone court’s view of the FSA. Nevertheless, because a SDCL 57A-9-609.1 statute of limitation question prevents a majority decision in favor of Fin-Ag on some FSA seller issues, and because of a number of conversion issues, both decisions are affirmed in part, reversed in part, and remanded for reconsideration consistent with this opinion.
I.
[¶ 2.] On June 27, 2002, Fin-Ag entered into an Agricultural Security Agreement (ASA) with Berwald Brothers,[2] Calvin Berwald, Michael Berwald, Kimberly Berwald, and Sokota Dairy, LLC (collectively Berwalds). The ASA granted Fin-Ag a security interest in collateral owned by Berwalds, including farm products (cattle). Under the ASA, all proceeds of cattle sales were to be jointly payable to Berwalds and Fin-Ag. The ASA also provided that no provision of the ASA could be interpreted to authorize non-inventory sales of collateral unless authorized by Fin-Ag in writing.
[¶ 3.] On July 2, 2002, Fin-Ag filed a UCC Financing Statement with the Secretary of State. The parties agree that this qualified as an effective financing statement (EFS) under the FSA. The EFS identified Berwald Partnership, Calvin Berwald, Michael Berwald, Kimberly Ber-wald, and Sokota Dairy, LLC as debtors. Although all livestock and farm products were listed as collateral on the UCC-1, the EFS portion of the financing statement only described the covered farm products as dairy cattle and milk.
[¶ 4.] On August 26, 2002, Fin-Ag and Berwalds executed a promissory note in the amount of $460,000, and on January 8, 2003, they executed a second promissory note in the amount of $4,110,000. The notes were secured by the collateral identified in the ASA. On August 23, 2004, Ber-walds defaulted on the promissory notes and filed Chapter 11 bankruptcy.
[¶ 5.] Berwalds ultimately filed an amended plan of reorganization, which required Berwalds to pay Fin-Ag the entire balance of its loans plus interest, costs and Fin-Ag’s attorney fees. Fin-Ag accepted this plan, and Fin-Ag receives monthly payments of $35,034.09. In the event Ber-walds default on those payments, Fin-Ag has the right to immediately liquidate and sell its collateral to satisfy the remaining debt. Fin-Ag acknowledges that the value of its collateral, including livestock, crops, equipment and real estate, exceeds the balance of the debt.
[¶ 6.] These cases were commenced as a result of several pre-default sales of cattle at the Sale Barns. Both Sale Barns are public auction barns (commission merchants) registered with the Secretary of State’s central filing system for effective financing statements. Therefore, each month they received portions of the master list identifying Fin-Ag’s debtors and *35 collateral subject to an EFS. Most of the cattle at issue were, however, sold under the name C & M Dairy, which is a d.b.a. for Calvin and Michael Berwald, and Fin-Ag did not include C & M Dairy on its EFS.
[¶7.] The Sale Barns’ business practices were quite similar. When cattle were delivered to each facility, a “yard man” asked the delivery person the name of the seller. SD Livestock also requested the identity of the owner. For each of the sales at issue except two,[3] the yard man was informed that the seller and/or owner of the cattle was C & M Dairy. Based on this information, the yard man completed a consignment ticket or “dock-in sheet” identifying the seller as C & M Dairy. Office personnel then reviewed the most recent Secretary of State’s master list to determine if C & M Dairy’s name appeared. Because C & M Dairy was not listed as a debtor, Fin-Ag was not made a co-payee on the proceeds checks from the cattle sales. Instead, SD Livestock generally issued checks to C & M Dairy alone. Pipe-stone generally issued checks to either C & M Dairy or to itself on C & M Dairy’s account to pay for C & M Dairy’s cattle purchases at that facility.[4] Ultimately, none of the proceeds at issue were remitted to Fin-Ag by C & M Dairy, Berwalds or Sale Barns.
[¶ 8.] The following sales and purchases, involving the following sellers and payees, are involved in these appeals:
Transactions at Pipestone
February 5, 2004: C & M Dairy sold five head of cattle through Pipestone for $8,348.06. Pipestone then issued a check to C & M Dairy for $3,848.06.
February 10, 2004: Calvin Berwald sold one head of cattle through Pipe-stone for $851.99. Pipestone then issued one check to Calvin Berwald for $351.99 and one check to C & L Farms for $500.[5]
February 19, 2004: C & M Dairy purchased four head of cattle for $4,675.
February 24, 2004: C & M Dairy sold nine head of cattle through Pipestone for $5,221.51. Pipestone then issued one check to C & M Dairy for $546.51 and one check to itself for $4,675 to pay for cattle previously purchased by C & M Dairy.
March 18, 2004: C & M Dairy purchased six head of cattle for $7,575.
March 30, 2004: C & M Dairy sold twelve head of cattle through Pipestone for $8,045.79. Pipestone then issued one check to C & M Dairy for $470.79 and one check to itself for $7,575 to pay for cattle previously purchased by C & M Dairy.
April 15, 2004: C & M Dairy purchased fifteen head of cattle for $19,925.
April 20, 2004: C & M Dairy sold thirteen head of cattle through Pipestone *36 for $12,538.20. Pipestone then issued a check to itself for $12,538.20 to pay for cattle previously purchased by C & M Dairy.
April 27, 2004: C & M Dairy sold ten head of cattle through Pipestone for $6,724.42. Pipestone then issued a check to itself for $6,724.42 to pay for cattle previously purchased by C & M Dairy.
Transactions at SD Livestock
July 24, 2002-June 16, 2004: C & M Dairy, on forty-eight separate occasions, sold a total of 546 head of cattle for $272,581.85 through SD Livestock. SD Livestock issued checks to C & M Dairy for that amount.
July 28, 2004: Michael Berwald sold thirteen head of cattle through SD Livestock for $12,007.60. SD Livestock then issued a check for $12,000.60 jointly payable to Michael Berwald and Dacotah Bank.
[¶ 9.] Fin-Ag initially sued Pipestone on December 17, 2004, and SD Livestock on January 4, 2005. In both cases, Sale Barns raised SDCL 57A-9-609.1 as a defense. That statute requires a lender such as Fin-Ag to “offer” to file a criminal complaint against its debtor before commencing a conversion action against an innocent third party. After apparently realizing that it had not offered to file a complaint before commencing the suits, Fin-Ag sent counsel for Sale Barns and Berwalds a letter, dated February 22, 2005, stating, “pursuant to SDCL 57A-9-609.1, Fin-Ag, Inc. hereby offers to file against the debtors, Berwald Partnership, Calvin Berwald, Michael Berwald, Kimberly Berwald, Sokota Daily, LLC, a complaint as defined [in] SDCL 23A-2-1.” After sending this letter, Fin-Ag re-filed and re-served identical summons and complaints on Sale Barns on March 10, 2005.
[¶ 10.] The parties filed cross-motions for summary judgment in both cases.

The Pipestone court (Judge Kean)

[¶ 11.] The Pipestone court held that: (1) Fin-Ag’s offer complied with SDCL 57A-9-609.1; (2) C & M Dairy was the seller under the FSA; (3) because C & M Dairy was not a listed debtor on Fin-Ag’s EFS, Pipestone took the cattle free of Fin-Ag’s security interest under the FSA for the February 5, 2004 sale in which Pipestone acted as a commission merchant; (4) for the remaining sales, the FSA did not protect Pipestone because Pipestone was acting as a lender when it applied sale proceeds to C & M Dairy’s account at Pipestone for prior purchases; and, (5) Pipestone’s application of the proceeds to its account interfered with Fin-Ag’s security interest, rendered Pipestone liable for conversion, and Fin-Ag suffered compensable damages.

SD Livestock court (Judge Timm)

[¶ 12.] The SD Livestock court held that: (1) Fin-Ag’s offer complied with SDCL 57A-9-609.1; (2) Berwalds, not C & M Dairy, were the sellers under the FSA; (3) because Berwalds were listed as debtors on the EFS, SD Livestock had notice of, and was subject to, Fin-Ag’s security interest under the FSA; and (4) SD Livestock was liable for conversion and Fin-Ag suffered compensable damages on all sales.
[¶ 13.] Sale Barns appeal raising the following issues which we have restated:
1. Whether Fin-Ag’s offer to file a criminal complaint complied with SDCL 57A-9-609.1.
2. Whether the FSA protected Sale Barns from liability for conversion.
*37 3. Whether Fin-Ag established entitlement to conversion.
Fin-Ag, by notice of review, contends that Pipestone was also liable for the February 5, 2004 sale by C & M Dairy, which Pipe-stone did not apply on account. Because all issues were decided on summary judgment we review them to:
[Djetermine whether the moving party demonstrated the absence of any genuine issue of material fact and [established] entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party[,] and reasonable doubts should be resolved against the moving party.... Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied.
Consol. Nutrition, L.C. v. IBP, Inc., 2003 SD 107, ¶ 8, 669 N.W.2d 126, 129 (citations omitted) (alteration in original). We decide issues of law de novo. City of Colton v. Schwebach, 1997 SD 4, 8, 557 N.W.2d 769, 771.
II.

1. SDCL 57A-9-609.1

[¶ 14.] Before commencing an action for conversion against an innocent purchaser or a livestock auction agency dealing in farm products, a lender must first “offer” to file a criminal complaint against the debtor. SDCL 57A-9-609.1.[6] The lender must also commence the conversion action within twenty-four months of the sale.[7] Id.
[¶ 15.] Sale Barns argue that Fin-Ag’s offer to file a complaint, in and of itself, did not comply with the statute. They contend that in addition to the offer, the statute requires that a lender must also “advise” or “inform a South Dakota State’s Attorney, the South Dakota Attorney General, or a law enforcement agency of its offer to file a criminal complaint.” Both circuit courts concluded that Fin-Ag’s written offer was sufficient. Because this is a matter of statutory construction, we review the matter de novo. In re Estate of Jetter, 1997 SD 125, ¶ 10, 570 N.W.2d 26, 28.
[¶ 16.] A fundamental rule of statutory construction is that “ ‘the intention of the law is to be primarily ascertained from the language expressed in the statute.’ ” Huber v. Dept. of Pub. Safety, 2006 SD 96, ¶ 14, 724 N.W.2d 175, 179 (quoting State v. $1,010.00 in Am. Curren *38 cy, 2006 SD 84, ¶8, 722 N.W.2d 92, 94 (citation omitted)). Furthermore, “ ‘we may not, under the guise of judicial construction, add modifying words to the statute or change its terms.’ ” City of Sioux Falls v. Ewoldt, 1997 SD 106, ¶ 13, 568 N.W.2d 764, 767 (quoting State v. Franz, 526 N.W.2d 718, 720 (S.D.1995)). “ ‘[I]t is always safer not to add to or subtract from the language of a statute unless imperatively required to make it a rational statute.’ ” Id. (quotation omitted). “ ‘The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said[.]’ ” Martinmaas v. Engelmann, 2000 SD 85, ¶ 49, 612 N.W.2d 600, 611 (quotation omitted).
[¶ 17.] These rules create an insurmountable barrier to Sale Barn’s argument. The statute fails to require that in addition to the offer, a State’s Attorney, the Attorney General, or a law enforcement agency must be “informed” or “advised” that an offer was made to the buyer.[8] Because the statute does not impose *39 this additional step, we may not “add such language [ ] that is not there[.]” Hannon v. Weber, 2001 SD 146, ¶ 5, 638 N.W.2d 48, 49. Considering the absence of statutory language requiring Sale Barn’s proposed additional step, we affirm the circuit courts’ judgments that Fin-Ag complied with the statute by making offers to the Sale Barns that it would file criminal complaints.

2. FSA Protection for Farm Products Purchased in the Ordinary Course of Business

[¶ 18.] The next issue is whether the FSA preempted the state law conversion actions and allowed the Sale Barns to take free of Fin-Ag’s security interests. Sale Barns argue that they are entitled to FSA protection from conversion because: C & M Dairy was the seller of the cattle; C & M Dairy was not on the master list of effective financing statements identifying Fin-Ag’s debtors and collateral; and therefore Sale Barns did not have the written notice necessary to disqualify them from protection under the FSA.
[IT-19.] Fin-Ag, on the other hand, argues that Berwalds, not C & M Dairy, were the 'sellers of the cattle, and that because Berwalds were on the master list, Sale Barns had written notice of Fin-Ag’s security interest disqualifying Sale Barns from protection under the FSA. Alternatively, Fin-Ag argues that even if C & M Dairy were considered the seller for purposes of notice, Sale Barns are still not protected because the FSA limits the Sale Barns’ protection to taking free of security interests “created by the seller.” 7 U.S.C. § 1631(d). And, Fin-Ag contends that C & M Dairy did not create the security interest, Berwalds did.
[¶ 20.] We thoroughly addressed these same “seller” issues involving Fin-Ag and virtually identical sales by C & M Dairy and Berwalds in Fin-Ag, Inc. v. Cimpl’s, Inc., 2008 SD 47, 754 N.W.2d 1.[9] We concluded that the FSA provided the buyers of farm products protection from conversion because: C & M Dairy was the seller; [10] C & M Dairy was not on the master *40 list giving buyers notice of Fin-Ag’s security interest; and because C & M Dairy was the alter ego of the Berwalds, C & M Dairy was regarded as having created the security interest within the meaning of 7 U.S.C. § 1631(d). Id.
[¶ 21.] -In the instant cases all but two sales[11] were made under the name C & M Dairy. Further, like the.situation in Cimpl’s, C & M Dairy was the alter ego (a d.b.a.) of Berwalds. Accordingly, for the reasons expressed in Cimpl’s, we again conclude that to the extent Sale Barns took the cattle sold by C & M Dairy,[12] it took them free of Fin-Ag’s security interest under the FSA, and Sale Barns cannot be liable for conversion.[13] We therefore reverse the judgment against SD Livestock for the July 24, 2002 — June 16, 2004 sales by C & M Dairy. Because Michael Berwald was the seller on the July 28, 2004 sale, and because Michael Berwald was identified on Fin-Ag’s EFS, the notice exception applied, and SD Livestock was not entitled to FSA protection for that sale. Liability for that sale is governed by our discussion of state law conversion in Issue 3, infra.
[¶ 22.] For the same reasons, Pipe-stone is protected by the FSA for C & M Dairy’s sales, and the judgment in favor of Pipestone is affirmed to the extent Pipe- *41 stone paid the proceeds of the sales to C & M Dairy (the February. 5, 2004 sale). FSA protection is not, however, automatically extended to the remaining sales where Pipestone retained the proceeds to satisfy C & M Dairy’s antecedent debt for prior cattle purchases. We now discuss Pipe-stone’s liability for those proceeds under the framework set forth in Consolidated Nutrition, 2003 SD 107, 669 N.W.2d at 126.

Acting as a Lender or as a Buyer in the Ordinary Course

[¶ 23.] • The Pipestone court concluded that to the extent Pipestone applied the proceeds on account, it was acting as a lender, not as a “buyer in the ordinary course of business.” Those sales occurred on February 24 ($4,675), March 30 ($7,575), April 20 ($12,538.20), and April 27, 2004 ($6,724.42). The Pipestone court concluded that there was no FSA protection for those sales, noting that they involved a priority dispute over proceeds governed by the Uniform Commercial Code. We agree.
[¶ 24.] Although a buyer in the ordinary course is generally protected by the FSA, it loses that protection when it acts as a lender by retaining sale proceeds to satisfy an antecedent debt. Consolidated Nutrition, 2003 SD 107, ¶ 15, 669 N.W.2d at 131. A “ ‘buyer in the ordinary course’ [is entitled to protection] under the FSA to the extent that it purehase[s] the [farm products] and [pays the seller]. However, [the buyer is] not entitled to that [protection] to the extent [ ] it act[s] as a creditor and sets off the sale proceeds to satisfy [the seller’s] preexisting debt.” Id. ¶ 14. The application of proceeds to a preexisting debt is not protected by the FSA because the buyer is not acting as a “buyer in the ordinary course.” Id. ¶ 12.
“Buying” does not include receiving goods or document of title under a preexisting contract as security “for or in total or partial satisfaction of a money debt,” SDCL 57A-l-201(b)(9), thereby excluding “attaching creditors and others who take goods in satisfaction of preexisting debts” from the definition of “buyer in ordinary course.”
Id. (citing Farmers & Merchants State Bank v. Teveldal, 524 N.W.2d 874, 878 (S.D.1994) (citing 2 James White & Robert Summers, Uniform Commercial Code § 26-13, at 533 n. 2 (3rd ed. 1988))). Because the FSA does not provide protection for such buyers and commission merchants, the Pipestone court was correct in concluding that the Uniform Commercial Code determined the priority of Fin-Ag’s and Pipestone’s conflicting claims.
[¶ 25.] Pipestone, however, argues that Consolidated Nutrition does not apply because this is a Minnesota transaction not governed by South Dakota law. We disagree. Even if Minnesota had the most significant relationship with these transactions (the Pipestone transactions occurred in Minnesota and involved a Minnesota sale barn) and Minnesota law applied, Pipestone’s argument is misplaced. Consolidated Nutrition involved an interpretation of the FSA, a federal enactment that is applicable in both States. Furthermore, Fin-Ag has cited no conflicting Minnesota interpretation of the FSA.
[¶ 26.] Alternatively, Fin-Ag argues that Consolidated Nutrition is distinguishable because the hog procurement contract in that case is different than C & M Dairy’s purchases on account. We again disagree. Pipestone allowed C & M Dairy to purchase cattle “on account” and Pipe-stone subsequently used the proceeds from future sales to pay the debt due on that account. Although there was no written contract as in Consolidated Nutrition, there was an open account thát created an implied contract requiring payment for the *42 antecedent debt. See SDCL 53-01-3 (providing that an implied contract is one whose “existence and terms ... are manifested by conduct”).
[¶ 27.] Because the FSA governs farm products purchases rather than priority disputes between competing lenders, this Court concludes that Pipestone had no FSA protection for those proceeds it paid to itself on account for C & M Dairy’s prior purchases. Therefore, the Pipestone court is affirmed on this issue, and Pipe-stone’s liability for conversion on the transactions involving proceeds is governed by Issue 3, regarding conversion under state law. Before addressing that issue, however, one FSA issue remains: whether Fin-Ag’s EFS description of the collateral was insufficient.

EFS Description of the Collateral under the FSA

[¶ 28.] SD Livestock raises this issue as an alternative argument for FSA protection. For a creditor to be entitled to the notice exception to buyer protection under the FSA, the EFS must not only give notice of the seller, but also the collateral. 7 U.S.C. § 1631(g)(2)(D)(i)(ii). Therefore, even if Fin-Ag provided notice of the seller in its EFS as required by the FSA, Fin-Ag’s EFS must have also adequately described the cattle. SD Livestock contends that Fin-Ag’s EFS was insufficient because it only listed “dairy cattle” as collateral, whereas many of the cattle sold were not dairy cattle. Relying on the sales tickets, SD Livestock points out that many sales involved: “white-face, red, cross-bred, Charoláis, and Charolais-cross” cattle. SD Livestock contends that these are not dairy cattle, and the circuit court’s denial of FSA protection must be reversed and remanded because the circuit court assumed that all of the cattle sold were dairy cattle.
[II29.] The EFS must contain “a description of the farm products subject to the security interest created by the debtor, including the amount of such products where applicable; and a reasonable description of the property.” 7 U.S.C. § 1631(c)(4)(D)(iv). A statement that substantially complies with this requirement, “even though it contains minor errors that are not seriously misleading,” will qualify as an EFS. 7 U.S.C. § 1631(c)(4)(I). The question is whether Fin-Ag’s collateral description of “dairy cattle” was seriously misleading. Although minor errors that are not seriously misleading will not invalidate an EFS, this error could qualify as seriously misleading if a distinction between dairy and other cattle is recognized in the cattle industry.
[¶ 30.] This issue is complicated by the United States Secretary of Agriculture’s regulations and interpretive opinions,[14] as well as the South Dakota Secretary of State’s implementing rules, which only offer two category descriptions for cattle: “dairy cattle” or “beef cattle.” There is no generic “cattle” description available under the South Dakota rules.[15] As previously noted, however, SD Livestock raises this issue as an alternative argument for FSA *43 protection. Therefore, it need only be addressed to the extent one concludes that there is no FSA protection because C & M Dairy was not the seller who must be regarded as having created the security interest.
[¶ 31.] In this ease, SD Livestock is generally entitled to FSA protection because C & M Dairy was the seller who must be regarded as creating a security interest in all but one relevant sale (the July 28, 2004 SD Livestock transaction in which Michael Berwald sold 13 head of cattle). And on that transaction, SD Livestock’s sales ticket reflects that all cattle were dairy cattle. Therefore, the dairy cattle description was not misleading, the notice exception applied, and SD Livestock was not entitled to FSA protection for that sale. Because all of the remaining SD Livestock sales involving different types of cattle were otherwise protected by the FSA, we need not decide the collateral description issue for those sales.

3. Conversion

[¶ 32.] Under this writing, the FSA did not protect Pipestone in the transactions in which it was acting as a lender or the February 10, 2004 Calvin Berwald sale. Nor did the FSA protect SD Livestock for the July 28, 2004 Michael Berwald sale. Under Justice Sabers’ writing, additional sales would not be protected by the FSA. Sale Barns next argue that even if they were not protected by the FSA, Fin-Ag failed to make sufficient summary judgment showings to support the judgments for conversion.[16] Sale Barns specifically contend Fin-Ag failed to prove that: (1) the cattle sold were cattle owned by Ber-walds subject to FimAg’s security interest; (2) the sales were unauthorized; and (3) Fin-Ag suffered compensable damages, or alternatively, that compensable damages could have reasonably been avoided or mitigated.
[¶ 33.] To prevail on summary judgment, “a plaintiff must establish each element of his or her prima facie case.” Hatchett v. Philander Smith College, 251 F.3d 670, 674 (8th Cir.2001). (citation omitted). “‘[T]hose resisting summary judgment must show that they will be able to place sufficient evidence in the record at trial to support findings on all the elements on which they have the burden of proof.’ ” Bordeaux v. Shannon County Schools, 2005 SD 117, ¶ 14, 707 N.W.2d 123, 127 (quoting Chenv-Age Indus., Inc. v. Glover, 2002 SD 122, ¶ 18, 652 N.W.2d 756, 765) (citation omitted); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986) (stating that entry of summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial). Therefore, to prevail on the various, claims and defenses, Fin-Ag must have submitted sufficient evidence to establish the elements of conversion, and Sale Barns must have submitted sufficient evidence to establish its affirmative defenses. Sufficient evidence requires establishment of a prima facie case. Mushitz v. First Bank of South Dakota, N.A., 457 N.W.2d 849, 859 (S.D.1990). “[A] prima facie case has been established [when] there ‘are facts in evidence which if unanswered would justify persons of ordinary reason and fairness in affirming the question which the plaintiff is bound to maintain.’ ” Sandner v. Minnehaha County, 2002 SD 123, ¶ 13, 652 *44 N.W.2d 778, 783 (quoting Rosen’s Inc. v. Juhnke, 513 N.W.2d 575, 577 (S.D.1994)).
[¶ 34.] “Conversion is the unauthorized exercise of control or dominion over personal property in a way that repudiates an owner’s right in the property or in a manner inconsistent with such right.” Chem-Age Indus., Inc. v. Glover, 2002 SD 122, ¶ 20, 652 N.W.2d 756, 766 (citation omitted). In general, a transferee who takes secured collateral from a debtor takes it subject to the creditor’s security interest and can be held liable for conversion. Rushmore State Bank v. Kurylas, Inc., 424 N.W.2d 649, 659 (S.D.1988) (citing UCC 9-306, cmt. 3). A cause of action for conversion' exists against an auction agency based on the debtor’s lack of authority to sell the collateral. Sanborn County Bank, Inc. v. Magness Livestock Exch., Inc., 410 N.W.2d 565, 567 (S.D.1987) (citations and emphasis omitted). Therefore, a “ ‘commission merchant who receives property from his principal, sells it under the latter’s instructions and pays him the proceeds of the sale, is guilty of a conversion if his principal had no title thereto or right to sell the property.’ ” Id. (quotation omitted). The basis of the liability for conversion is the fact that the commission merchant stands in the shoes of his principal. Id. (citations omitted). It is immaterial that the agent had neither knowledge nor notice that the principal was committing a wrong by the sale. Id.

Were These Berwalds’ Cattle Subject to Fin-Ag’s Security Interest

[¶ 35.] To be entitled to summary judgment, Fin-Ag must have first made a prima facie showing that the cattle sold were Berwald cattle subject to Fin-Ag’s security interest. To make that showing, Fin-Ag offered a deposition of Calvin Berwald, taken in a bankruptcy proceeding, as evidence of Berwalds’ ownership of the cattle. Sale Barns objected to the use of this deposition. Sale Barns point out that they were neither present nor represented at this deposition, nor did they have notice of the deposition. In fact, they were not even aware of a potential claim against them at the time of this deposition. Therefore, they contend the deposition could not be used against them under SDCL 15-6-32(a). Sale Barns also allege that even if the deposition is considered, it does not supply evidence that Ber-walds owned the specific cattle sold in each of these transactions.
[¶ 36.] At the summary judgment stage, however, even assuming that the deposition could not be used, Fin-Ag was only required to establish a prima facie case; i.e., sufficient facts which if unanswered would justify persons of ordinary reason and fairness in believing that these were collateral cattle owned by Berwalds. See Sandner, 2002 SD 123, ¶ 13, 652 N.W.2d at 783. In our view, aside from the Calvin Berwald deposition, Fin-Ag established a prima facie case.
[¶ 37.] Regarding Pipestone, Fin-Ag showed: (1) that Pipestone withheld money from the C & M Dairy sales because Calvin Berwald owed money for prior cattle purchases; (2) that Calvin Berwald directed where C & M Dairy’s proceeds should be sent; and (3) that the proceeds checks were endorsed by Calvin or Michael Berwald. Regarding SD Livestock, the payments made to C & M Dairy were also sent to the Berwalds home and were endorsed by Calvin or Michael Berwald. This evidence, if unanswered, would justify a person of ordinary reason in believing that Berwalds had an ownership interest in the cattle that was subject to Fin-Ag’s security interest. Furthermore, Sale Barns did not identify contradictory evidence. Instead, they only argue that Fin-Ag’s showing was insufficient. This argu *45 ment overlooks the minimal quantum of proof necessary to make a prima facie showing. We conclude that a prima facie case was established, that Sale Barns did not identify conflicting facts, and the circuit courts did not err in explicitly (or implicitly) deciding that the sales at issue involved Berwalds’ cattle subject to Fin-Ag’s security interest.

Unauthorized (and Authorized) Sales

[¶ 38.] Sale Barns next contend that Fin-Ag failed to make a sufficient summary judgment showing that the sales were unauthorized. This issue encompasses both the elements of conversion and defenses. As an element of its conversion claim, Fin-Ag must have established that the sales were unauthorized; i.e. that Sale Barns exercised unauthorized control or dominion over Fin-Ag’s collateral. Chem-Age Indus., 2002 SD 122, ¶ 20, 652 N.W.2d at 766. On the other hand, Sale Barns had the burden of establishing its defenses, i.e., that through its conduct, Fin-Ag authorized or waived its interests in the sales. Aberdeen Prod. Credit Ass’n v. Redfield Livestock Auction, Inc., 379 N.W.2d 829, 831 (S.D.1985).
[¶ 39.] Fin-Ag established its prima fa-cie case of showing unauthorized sales through: (1) the ASA, which prohibited non-inventory sales without the written consent of Fin-Ag, and (2) the affidavit of Robert Goetz, the operations manager of Fin-Ag, who stated that Berwalds were not authorized to sell cattle under the name C & M Dairy. Furthermore, Sale Barns did not identify conflicting facts. Instead, they again only argued the defense that Fin-Ag authorized the sales through another provision of the ASA permitting inventory sales in the ordinary course of business. Sale Barns, however, offered no facts establishing a prima facie case that these cattle involved authorized sales of inventory. We therefore conclude that Fin-Ag met its burden showing that the sales were unauthorized.
[¶ 40.] Sale Barns next raise the defense that these were authorized sales in which Fin-Ag waived its rights because Fin-Ag impliedly allowed Ber-walds to sell over 2,000 head of cattle through C & M Dairy to various buyers over the course of two years, while never requiring that Fin-Ag be included as a co-payee.[17] Implied authorization is a defense. See Aberdeen Prod. Credit, 379 N.W.2d at 834. Sale Barns support this *46 implied authorization defense with evidence suggesting that Fin-Ag should have known Berwalds were selling these cattle through C & M Dairy.[18] Fin-Ag responds with the ASA’s requirement of a written authorization and the affidavit of Goetz. Although these conflicting facts relating to Fin-Ag’s knowledge and conduct might, in other legal contexts, create an issue of fact relating to implied authorization, implied authorization through course of dealing is not recognized as a matter of law in this UCC context. An implied authorization to sell collateral is not recognized in either South Dakota or Minnesota if it is contrary to the express provisions of the security agreement. Aberdeen Prod. Credit, 379 N.W.2d at 832, Wabasso State Bank v. Caldwell Packing Co., 308 Minn. 349, 356, 251 N.W.2d 321, 325 (1976).[19] Therefore, Sale Barns’ showings did not raise a material issue of disputed fact relating to its defense of implied authorized sales of cattle.

Damages

[¶ 41.] Damages are a basic prerequisite to recovery on a conversion theory. “[T]he foundation for the action of conversion ... rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results.” Chem-Age Indus., Inc., 2002 SD 122, ¶ 20, 652 N.W.2d at 766 (emphasis added). As the party seeking to recover damages, Fin-Ag bears the burden of proving damages “ ‘with reasonable certainty.’ ” Kobbeman v. Oleson, 1998 SD 20, ¶ 6, 574 N.W.2d 633, 635 (quotation omitted). SDCL 21-3-3[20] creates a presumption that damages were incurred “at the time of the conversion ...” and allows fair compensation for the time and money expended in pursuit of the *47 property. However, the presumption does not eliminate the need for a conversion plaintiff to allege and present proof of actual harm. Security State Bank v. Benning, 433 N.W.2d 232, 234-35 (S.D.1988). “It is fundamental that damages which are uncertain, contingent or speculative cannot be made the basis of recovery.” Kunkel v. United Sec. Ins. Co. of N.J., 84 S.D. 116, 135, 168 N.W.2d 723, 733 (1969).
[¶ 42.] Sale Barns argue that in the event we conclude Fin-Ag established a prima facie case of conversion, Fin-Ag failed to establish compensable damages. They contend that all of the proceeds from the sales were returned to the dairy operation for which Fin-Ag made the loans. Sale Barns also contend that Fin-Ag suffered no damages because they will be made whole in the Berwald bankruptcy. Sale Barns point out that Fin-Ag is an over-secured creditor, and under the confirmed bankruptcy plan, Fin-Ag is scheduled to receive the balance of the indebtedness plus interest and attorney’s fees. Sale Barns further point out that Fin-Ag still retains an interest in Berwalds’ collateral. Thus, Sale Barns contend that Fin-Ag will be able to liquidate and sell the secured collateral to cover the loans should the plan not be completed. Sale Barns finally contend Fin-Ag failed to avoid and/or mitigate their damages.
[¶ 43.] The circuit courts did not, however, consider each of these issues. Additionally, on remand, a defense relating to conversion may be decided such that the issue of damages need not be reached. We therefore decline Sale Barns request to direct summary judgment on damages. The damage issues are remanded for consideration by the circuit courts. See Aberdeen Prod. Credit, 379 N.W.2d at 832-33.
[¶ 44.] For the foregoing reasons, we
1. Affirm both courts’ conclusions that Fin-Ag’s offers complied with SDCL 57A-9-609.1;
2. Although there are not three votes to affirm any FSA seller issue involving C & M Dairy in favor of Fin-Ag, there are three or more votes and we therefore (to the extent not otherwise covered by this opinion) generally affirm the result of the Pipestone court judgment in favor of Pipestone and reverse the result of the SD Livestock court judgment against SD Livestock;
3. Affirm the Pipestone' court’s conclusion that the FSA did not protect Pipestone for those sales in which it applied proceeds to C & M Dairy’s account;
4. Pursuant to the parties’ agreement, reverse the SD Livestock court’s judgment regarding the nine sales that occurred prior to March 10, 2003; and,
5. Reverse and remand the judgments on any non-FSA protected sales for further proceedings consistent with this Court’s opinion on the conversion issues.
[¶ 45.] MEIERHENRY, Justice, concurs.
[¶ 46.] GILBERTSON, Chief Justice dissents in part and concurs in result in part.
[¶ 47.] SABERS and KONENKAMP, Justices, dissent in part and concur in result in part.

. Fin-Ag also brought similar actions against other sale barns and purchasers of the same debtors' cattle. See Fin-Ag, Inc. v. Watertown Livestock Auction, Inc., 2008 SD 49, 754 N.W.2d 23 and Fin-Ag, Inc. v. Cimpl’s, Inc., 2008 SD 47, 754 N.W.2d 1.

. Berwald Brothers is a general partnership, including Calvin and Michael Berwald as general partners.
During the second oral argument in these cases, new counsel for Sale Barns observed that "Berwald Brothers” signed the ASA, but “Berwald Partnership” rather than "Berwald Brothers” was listed on the UCC-l/EFS. The suggestion was made that this omission entitled Sale Barns to prevail. This argument was not presented to the circuit court and was not briefed in this appeal. We therefore decline to consider the argument, leaving it to the circuit courts on remand. See Millard v. City of Sioux Falls, 1999 SD 18, ¶ 30, 589 N.W.2d 217, 221. Because we decline to consider the issue, we also decline Fin-Ag’s post-oral argument request to take judicial notice of an amendment to its UCC-l/EFS filing.

. On February 10, 2004, Pipestone was noti-fled that the seller was Calvin Berwald. On July 28, 2004, SD Livestock was notified that the seller was Michael Berwald.

. Although there was no written agreement, C & M Dairy purchased cattle at Pipestone on account. Pipestone would then apply subsequent sale proceeds to C & M Dairy’s account to pay for C & M Dairy’s previously purchased cattle.

. Pipestone does not contest its liability for the $351.99 check issued to Calvin Berwald if this Court determines that Fin-Ag complied with SDCL 57A-9-609.1. Because we determine that Fin-Ag complied with SDCL 57A-9-609.1, we direct judgment in favor of Fin-Ag for this amount. Regarding the $500 check issued to C & L Farms, the parties have not briefed liability for this check, and therefore we decline to consider the issue on appeal.

. SDCL 57A-9-609.1 provides:
No cause of action for recovery of security or its value may be commenced by a secured creditor against an innocent third-party purchaser of farm products as defined in subsection (34) of § 57A-9-102, nor may such a cause of action be commenced against a livestock auction agency, as defined in chapter 40-15 and § 301 of the Packers and Stockyards Act (7 U.S.C. 201), or a public grain warehouse, or a public terminal grain warehouse, or a grain dealer as defined by chapters 49-43, 49-44, and 49-45 respectively, unless such action is commenced within twenty-four months from the date the farm products are sold and unless such action is preceded by the secured creditor offering to file against the debtor, a complaint as defined by § 23A-2-1.

. SD Livestock points out that nine sales at that facility occurred prior to March 10, 2003, more than twenty-four months before the second action was commenced following the offer to file a criminal complaint. Consequently, SD Livestock argues that these nine transactions were time-barred by the twenty-four month statute of limitations in SDCL 57A-9-609.1. On appeal, Fin-Ag concedes that nine sales occurred more than twenty-four months before the filing of the second complaint and were time-barred. Fin-Ag agrees that summary judgment was incorrectly granted on those sales. Therefore, the judgment on those sales is reversed.

. It is significant that SDCL 57A-9-609.1 does not direct where the initial offer should be made. In light of this omission, it is reasonable to believe that the Legislature did not intend law enforcement entanglement at this civil stage of the controversy. It is reasonable because an innocent purchaser of collateral will only become a "victim” if the secured creditor continues to pursue the civil conversion action, thereby subjecting the purchaser to double liability. By failing to mandate law enforcement intervention at the offer stage of the civil controversy, the Legislature has given a potential victim a voice in the matter. The failure to mandate law enforcement intervention at this stage requires the secured creditor to communicate with an innocent victim, thereby allowing all parties to consider the consequences of their proposed actions before they become fully immersed in civil and criminal litigation.
The dissent suggests the Legislature did not have these purposes in mind. Instead, the dissent suggests that the Legislature was concerned with effective law enforcement, and that failing to make an offer with a law enforcement agency would not result in an effective criminal prosecution thereby making the offer a useless act. Infra UK 49-50. There is, however, nothing in the text or history of the statute to support the dissent’s speculation. If anything, the Legislature’s enactment of this measure as a statute of limitations for the filing of a civil action suggests that effective criminal prosecution was not its motivation. This is confirmed by the title of the legislation of which SDCL 57A-9-609.1 was a part: "An Act to reenact the revised secured transactions article of the Uniform Commercial Code.” See 2000 SD Laws ch. 231, § 9-609.1.
The dissent also incorrectly suggests that because Sale Barns were "aware of Fin-Ag’s claim to the proceeds from Berwalds' sale of cattle,” the offer subjects parties to a criminal misprison of a felony offense. Infra ¶51. This argument fails to acknowledge the distinction between an action for civil conversion and a criminal action for the sale of mortgage property. The dissent is correct that at the time the offer is made under SDCL 57A-9-609.1, the secured creditor is simply "aware of [the secured creditor's] claim to the proceeds.” Id. This is consistent with the pursuit of a civil action for conversion: the plaintiff need only be aware that an innocent transferee (in this case, a sale barn) has sold secured cattle. See infra ¶ 34. Awareness of wrongful conduct on the part of the debtor is immaterial. Rushmore State Bank v. Kurylas, Inc., 424 N.W.2d 649, 659 (S.D.1988). Therefore, the knowledge necessary for a secured creditor to proceed with a civil conversion action is far less than the knowledge of wrongful criminal conduct necessary to know that a criminal sale of mortgaged property has occurred under SDCL 44-1-12. In the latter criminal offense, the secured creditor must not only know that an innocent party has obtained control of its collateral, but also that its debtor has willfully disposed of that collateral and its proceeds. Id. Considering this distinction, considering the short occurrence statute of limitations, and considering the substantial time that often expires before a secured creditor is even aware of a debtor’s disposition of collateral, it is inconceivable that the Legislature would have intended criminal consequences for a secured creditor’s act of making the statutory offer before it had criminal knowledge of the circumstances *39 under which its debtor participated in the sale. More importantly, regardless of the interpretation of SDCL 57A-9-609.1, the statute does not alter a person's duty to report if the person has the requisite level of knowledge that a felony has been committed. The mis-prison duty remains under either interpretation.
Finally, the dissent's suggestion that "[o]ur Legislature has not condoned the practice” of “attempting to negotiate an arrangement that might avoid law enforcement intervention,” see infra ¶¶ 53-54 is simply incorrect. The Legislature often requires civil notice and negotiation to avoid law enforcement involvement after the commission of a crime but before a prosecution is commenced. In the area of theft alone, the Legislature has mandated similar civil notices in three instances. See SDCL 22-30A-32 (requiring a civil notice of dishonor and opportunity to pay an insufficient funds or no account check before the criminal prosecution is commenced); SDCL 22-30A-40-44 (requiring similar preliminary civil efforts to resolve criminal motor vehicle fuel theft); and SDCL 22-30A-19.3 (involving preliminary civil demands in retail theft).

. Although Sale Barns are commission merchants unlike the buyer involved in Cimpl’s, the applicable provisions of the FSA are the same. Compare 7 U.S.C. § 1631(d)(e) and § 1631(g).

. The relevant facts in Cimpl’s are also within the Pipestone/SD Livestock record. In addition to the facts present in Cimpl’s, this record further indicates that C & M Dairy was the seller. Calvin Berwald’s deposition testimony reflected:
C & M Dairy was our cattle business, and Pipestone Livestock-I mean I bought thousands of cattle from that barn when I >was in the cattle business. The only way they knew us was by C & M Dairy. ■
*40 I don't think we ever sold anything at that place that wasn’t listed and [sic] C & M Dairy.
C & M Dairy was our Clear Lake facility which we used mostly for buying and selling cattle. I mean we used that-that deal for, I mean, I suppose ten years. There was a milk permit under there, too.

. The two exceptions are the February 10, 2004 sale by Calvin Berwald at Pipestone and the July 28, 2004 sale by Michael Berwald at SD Livestock.

. In determining who was the seller, the SD Livestock court failed to consider that the Berwalds had been doing business as C & M Dairy for a considerable period of time. The FSA requires that the master list must give notice that the "seller” is subject to an EFS. 7 U.S.C. 1631(e)(3). And, an EFS must identify all persons who are "indebted to the secured party.” 7 U.S.C. 1631(c)(4)(C). This would include Calvin and Michael Berwald d.b.a. C & M Dairy.

. Fin-Ag argues that Sale Barns knew, or should have known that C & M Dairy was, in fact, Berwalds. The basis of this argument is an investigation conducted by Fin-Ag wherein Pipestone admitted that Calvin Berwald was the individual who delivered the cattle for sale at Pipestone. In that investigation, Pipe-stone also admitted that Calvin Berwald directed Pipestone how the cattle sale proceeds should be paid. Fin-Ag points out that Pipe-stone would issue proceeds checks to C & M Daily but use the same mailing address that it used for sales made by Calvin Berwald. Moreover, there is a dispute as to whose name was on the Pipestone account,’ Ber-walds or C & M Dairy. Finally, the checks issued to C & M Dairy were endorsed by either Calvin or Michael Berwald. A similar argument applies to SD Livestock.
Those allegations, however, do not create a genuine issue of material fact for trial. "A disputed fact is not ‘material’ unless it would affect the outcome of the suit under the governing substantive law.” Weitzel v. Sioux Valley Heart Partners, 2006 SD 45, ¶ 17, 714 N.W.2d 884, 891 (citation omitted). Here, even if Sale Barns had actual knowledge that C & M Daily consisted of Berwalds, they still did not have written notice from the master list that C & M Dairy was subject to Fin-Ag's security interest under 7 U.S.C. § 1631 (g)(2)(D)(i)(ii). Sale Barns had no additional duty to check public records to determine the precise legal relationship between the Berwalds and C & M Dairy. Because Sale Barns had no duty to determine the legal relationship between Berwalds and C & M Dairy, and because actual knowledge of the security interest is irrelevant, [Cimpl’s, 2008 SD 47, ¶ 15, 754 N.W.2d 1,] these allegations did not create a genuine issue of material fact preventing summary judgment on this issue.

. See generally 9 CFR§ 205.106.

. According to South Dakota’s filing procedures, a secured party completing an EFS must list a code for the farm products by selecting a code from a list provided. See Chris Nelson, Secretary of State, UCC Filing Procedures (2003). Notably, there is no EFS code listed for "cattle.” Instead, there are separate codes for "beef cattle” and "dairy cattle.” Id. Fin-Ag's EFS listed only "dairy cattle and milk.” The cattle at issue here would have most likely been covered by the EFS if Fin-Ag would have listed the codes and descriptions for both "dairy cattle” and "beef cattle.” However, by listing only the “dairy cattle” code and description, Fin-Ag may have excluded other types of cattle.

. The parties have not raised a choice of laws issue. They have briefed and argued this matter under South Dakota law. We therefore generally review the matter under South Dakota law.

. Sale Bams also argue that the sales were authorized, and Fin-Ag's interests were waived or extinguished because Fin-Ag had no security interest as a result of its failure to amend its financing statement/EFS to reflect material changes under 7 U.S.C. § 1631(c)(4)(D). However, we need not address the FSA aspects of this issue because we have already determined that Sale Barns are generally entitled to FSA protection.
To the extent that a failure to amend the financing statement may arise under the UCC on remand, the parties may litigate that issue. Judge Kean did not address the issue in his decision. Although Judge Timm addressed it, there are material issues of disputed fact precluding summary judgment on the issue of the duty to amend a financing statement (as well as an EFS). Those facts include allegations that Fin-Ag should have been aware that C & M Dairy was making substantial cattle sales in the region under the name C & M Dairy. There was also a prior lawsuit in which Fin-Ag acknowledged that C & M Dairy was a d.b.a. for Berwalds business. See infra n. 18. These facts are relevant to determine whether Fin-Ag should have amended its financing statement (or EFS) to preserve its security interest. Whether Fin-Ag’s research of alleged unauthorized cattle sales was reasonably sufficient to not require amendment is a question of fact that is not appropriate for summary judgment. Considering the conflicting facts, at the summary judgment stage, Judge Timm erred in finding that Fin-Ag’s research was sufficiently reasonable.

. On October 4, 2002, an un-related lawsuit was brought against Berwalds, "d/b/a C & M Dairy” and Fin-Ag, Inc. This lawsuit, Fin-Ag responds, did not pertain to the sale of cattle by Berwalds under the name C & M Dairy; instead, it concerned a debt for consulting services and breach of a loan agreement. However, the lawsuit arose when Calvin and Michael Berwald d/b/a C & M Dairy entered into a purchase agreement in which they sold 150 head of cattle to R & J Van Beek, LLC. The purchase order, incorporated into the complaint, specifically listed C & M Dairy as the seller. R & J Van Beek, LLC commenced the action against Berwalds, specifically Calvin and Michael Berwald d/b/a C & M Dairy, over this purchase agreement. Fin-Ag was also a named party in the lawsuit. In its answer in that lawsuit, Fin-Ag admitted that Berwalds, d/b/a C & M Dairy, owned and operated a dairy operation in Toronto, South Dakota. Following this acknowledgment, Fin-Ag did not amend its financing statement to include C&M Dairy as a debtor.

. Sale Barns also argue Fin-Ag authorized the sales under SDCL 57A-9-315(a)(l), providing that although a security interest continues in collateral notwithstanding its sale, its disposition may be authorized. Because this statute was not raised before the circuit courts, we decline to review this argument for the first time on appeal. See State v. OlsonLame, 2001 SD 51, ¶ 6, 624 N.W.2d 833, 834; Beckel v. Gerber, 1998 SD 48, ¶ 24, 578 N.W.2d 574, 579.

.SDCL 21-3-3 provides:
The detriment caused by the wrongful conversion of personal property is presumed to be:
(1) The value of the property at the time of the conversion, with the interest from that time;
(2) Where the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict, without interest, at the option of the injured party;
(3) A fair compensation for the time and money properly expended in pursuit of the property.
Such presumptions cannot be repelled in favor of one whose possession was wrongful from the beginning by his subsequent application of the property to the benefit of the owner, without his consent.